1                 UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF OHIO

2                    WESTERN DIVISION

3  UNITED STATES OF AMERICA,    - Docket No. 3:06-CR-719
                           -

4     Plaintiff,             - Toledo, Ohio
                           - October 21, 2009

5       v.                   - Sentencing
                           -

6  WASSIM MAZLOUM, et al.,     -
                           -

7     Defendants.           -
  -------------------------------

8

9               TRANSCRIPT OF SENTENCING
         BEFORE THE HONORABLE JAMES G. CARR

10      UNITED STATES DISTRICT CHIEF JUDGE

   APPEARANCES:

11

   For the Plaintiffs:  United States Attorneys' Office

12                 By:     Thomas E. Getz
                     Justin E. Herdman

13               801 Superior Avenue, W
               Cleveland, OH 44113

14              (216) 622-3840

15              U.S. Department of Justice
              By:  Jerome J. Teresinski

16                 David I. Miller
              10th & Constitution Ave, NW

17              Washington, DC 20530
              (202) 353-3464

18

              Office of the U.S. Attorney- Austin

19              By:  Gregg N. Sofer
              816 Congress Avenue

20              Austin, TX 78701
              (512) 916-5858

21

22

23

24

25

```
 1    For the Defendant Amawi: Office of the Federal Public
                               Defender - Cleveland
 2                             By:  Amy B. Cleary
                                    Jonathan P. Witmer-Rich
 3                                  Edward G. Bryan
                                    Timothy C. Ivey
 4                             750 Skylight Office Tower
                               1660 West Second St.
 5                             Cleveland, OH 44113
                               (216) 522-4856
 6
                               Muawad & Muawad
 7                             By:  Elias Muawad
                               36700 Woodward Avenue, Suite 209
 8                             Bloomfield Hills, MI 48304
                               (248) 594-4700
 9
      For the Defendant        Kerger & Kerger
10    El-Hindi:                By:  Stephen D. Hartman
                               Suite 201
11                             33 South Michigan Street
                               Toledo, OH 43602
12                             (419) 255-5990

13                             Boss & Vitou
                               By:  Charles M. Boss
14                             111 West Dudley Street
                               Maumee, OH 43537-2140
15                             (419) 893-5555

16                             Raslan, El-Kamhawy & Pla
                               By:  Alek H. El-Kamhawy
17                             Suite 3FE, 1700 East 13 Street
                               Cleveland, OH 44114
18                             (216) 928-1500

19    For the Defendant        David L. Doughten
      Mazloum:                 4403 St. Clair Avenue
20                             Cleveland, OH 44103-1125
                               (216) 361-1112
21
                               Helmick & Hoolahan
22                             By:  Jeffrey J. Helmick
                               2nd Floor
23                             1119 Adams Street
                               Toledo, OH 43624-1508
24                             (419) 243-3800

25
```

```
 1                             Mohammed Abdrabboh
                              1620 Ford Avenue
 2                             Wyandotte, MI 48192
                              (734) 283-8405
 3
       Court Reporter:        Tracy L. Spore, RMR, CRR
 4                             1716 Spielbusch Avenue
                              Toledo, Ohio 43624
 5                             (419) 243-3607

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
       Proceedings recorded by mechanical stenography,
24     transcript produced by notereading.

25
```

1                   (Commenced at 6:09 p.m.)

18:09:58   2           THE CLERK:  3:06-CR-719.  United States of

18:10:02   3  America versus Wassim Mazloum.  Matter called for

18:10:04   4  sentencing.

18:10:10   5           THE COURT:  The record should show that the

18:10:12   6  government is represented by Assistant United States

18:10:14   7  Attorney Justin Herdman and other counsel previously

18:10:17   8  appearing throughout these proceedings.  The defendant

18:10:20   9  is present in court with his attorney, Mr. David

18:10:23  10  Doughten and Mr. Jeff Helmick.

18:10:25  11          And, Mr. Herdman, have you received and

18:10:29  12  reviewed the presentence report?  If so, do you have any

18:10:31  13  objections that have not been resolved?  And if not, are

18:10:35  14  you prepared to proceed with sentencing?

18:10:38  15          MR. HERDMAN:  We do not have any objections

18:10:41  16  outstanding, Your Honor.  I believe they've all been

18:10:43  17  resolved.

18:10:44  18          THE COURT:  Mr. Helmick, have you and Mr.

18:10:46  19  Doughten received a copy of the presentence report?  If

18:10:49  20  so, do you have any unresolved objections?  If not, are

18:10:52  21  you prepared to proceed with sentencing?

18:10:54  22          MR. HELMICK:  Yes, we have received a copy

18:10:57  23  of the report.  We shared the report with him.  We have

18:10:59  24  no unresolved objections at this time.  We're ready to

18:11:03  25  proceed forward with sentencing.

```
18:11:05   1              THE COURT:  Mr. Mazloum, did you review or
18:11:07   2   read a copy of the presentence report?
18:11:12   3              THE DEFENDANT:  Yeah, I read it, Your Honor.
18:11:14   4              THE COURT:  Did you understand what it said,
18:11:16   5   what it says and what it means?
18:11:17   6              THE DEFENDANT:  Yes.
18:11:18   7              THE COURT:  And are you confident that your
18:11:20   8   attorneys have taken enough time with you to go over it
18:11:25   9   with you, to answer any questions you might have about
18:11:28  10   it and to explain it to you fully?
18:11:30  11              THE DEFENDANT:  Yes, Judge.
18:11:31  12              THE COURT:  And are you also confident that
18:11:33  13   they've taken the time necessary to enable both them and
18:11:36  14   you to be as prepared as you can be for the proceeding
18:11:41  15   this evening?
18:11:42  16              THE DEFENDANT:  Yes, Judge.
18:11:45  17              THE COURT:  Mr. Herdman?
18:11:48  18              MR. HERDMAN:  Thank you, Your Honor.  Your
18:11:50  19   Honor, the evidence as it relates to Defendant Wassim
18:11:54  20   Mazloum firmly established that Mr. Mazloum was an
18:12:05  21   energetic, eager, enthusiastic, willing, and deadly
18:12:12  22   serious member of this conspiracy.  And the jury agreed
18:12:16  23   with that assessment in rendering their verdicts.  Now,
18:12:21  24   I do want to talk about the evidence a little bit.  As
18:12:24  25   I said I'd try to keep my remarks brief, but there are
```

18:12:28    1    some key moments in Mr. Mazloum's participation in this

18:12:34    2    conspiracy.

18:12:34    3            THE COURT:  Give me one moment.   I'm doing

18:12:38    4    something on my computer.   I apologize.

18:13:17    5            Okay.

18:13:18    6            MR. HERDMAN:  There are a few key moments

18:13:20    7    that relate to Mr. Mazloum's participation in the

18:13:22    8    conspiracy.  I will direct the Court's attention to

18:13:24    9    those.   But there are also some themes that I think run

18:13:27   10    throughout his participation in this conspiracy.

18:13:29   11            One of them is the deadly serious nature of

18:13:32   12    his solicitation of training from Darren Griffin.   Mr.

18:13:37   13    Mazloum very explicitly and very frankly told Darren

18:13:43   14    Griffin that what he wanted to receive training in was

18:13:46   15    manufacturing explosives, building IEDs, and acquiring

18:13:51   16    training in conducting ambushes on military forces.

18:14:00   17            The second theme that is quite apparent from

18:14:02   18    the outset is Mr. Mazloum perhaps more so than any other

18:14:06   19    defendant appears very eager to start the training; to

18:14:10   20    accelerate the pace of the training; to, quote, speed

18:14:14   21    things up, to move things.   And I think you'll

18:14:19   22    remember, Your Honor, one of the quotes from his own

18:14:21   23    mouth was that time is gold and that this was something

18:14:25   24    that was driving him more so than any other element, and

18:14:29   25    I would submit more so than any other defendant.

18:14:35  1          Now, Mr. Mazloum was recruited into this

18:14:38  2   conspiracy, recruited by Mohammad Amawi.   And so

18:14:42  3   therefore his entry into the conspiracy is different

18:14:48  4   than that of -- you've heard arguments from counsel for

18:14:53  5   Amawi and El-Hindi; he was induced not by Darren

18:14:57  6   Griffin, but he was induced by Mohammad Amawi to enter

18:15:00  7   this conspiracy.   The first mention we have about

18:15:03  8   Mazloum comes from the lips of Mohammad Amawi himself; I

18:15:06  9   believe it was November 4 of 2004.   And Mohammad Amawi

18:15:09  10  suggests Wassim Mazloum.   He also suggests some other

18:15:12  11  individuals.   But he suggests Wassim Mazloum as a man

18:15:17  12  who's serious and will make a good candidate for

18:15:20  13  training, training for jihad.   This is all in the

18:15:23  14  context of training for jihad.

18:15:29  15          On the same -- I apologize, Your Honor.   Let

18:15:32  16  me back up.

18:15:33  17          November 4 is actually the first time that

18:15:35  18  we have a recording where Mohammad Amawi speaks to

18:15:37  19  Wassim Mazloum.   I believe it was a week or so before

18:15:40  20  that that he mentioned Mazloum as a potential recruit.

18:15:44  21  I apologize for that.   But on November 4, 2004, in the

18:15:47  22  presence of Darren Griffin, Mohammad Amawi calls Wassim

18:15:51  23  Mazloum.   This is a rather critical conversation because

18:15:53  24  what this conversation establishes is that Mohammad

18:15:56  25  Amawi and Wassim Mazloum have talked about Darren

18:16:01 1   Griffin.   And when Mohammad Amawi refers to the subject

18:16:06 2   of training, he doesn't say training; he doesn't say

18:16:09 3   shooting; he doesn't say firing range.   He says, "That

18:16:12 4   subject that we talked about."   And that right there,

18:16:14 5   Your Honor, indicates that not only is this a subject

18:16:17 6   that they don't want to discuss on the phone, but it's a

18:16:20 7   subject that Mohammad Amawi and Wassim Mazloum have

18:16:24 8   reached a mutual understanding on.   What is the nature

18:16:28 9   of this training?   There's really no question about it.

18:16:31 10  It's training for jihad.   And specifically as we

18:16:35 11  learned from Mr. --

18:16:36 12          THE COURT:  So you would say at least

18:16:38 13  sometime prior to then, the term might be used earlier,

18:16:42 14  jointly predisposed would fit here?

18:16:44 15          MR. HERDMAN:  Yes, Your Honor.

18:16:45 16          THE COURT:  Particularly by the time he

18:16:47 17  meets Griffin?

18:16:48 18          MR. HERDMAN:  Well, before that time, Your

18:16:52 19  Honor, because it's not until about a week -- I'm sorry,

18:16:56 20  two weeks later that he actually meets Darren Griffin

18:16:58 21  for the first time.

18:17:02 22          Now, that fact alone is important because

18:17:05 23  remember, Mohammad Amawi's a person who does not trust

18:17:07 24  the purpose of this training with just anyone.   It was

18:17:13 25  referred to when his brother testified on the stand

18:17:15   1   yesterday that Mohammad Amawi didn't want his own

18:17:17   2   brother Amr to know what the purpose of their trips to

18:17:21   3   the shooting range was for.   I'm not going to play that

18:17:24   4   clip for you, but I can --

18:17:26   5              THE COURT:  I remember it.

18:17:28   6              MR. HERDMAN:  It was from J1D57 just for the

18:17:31   7   record.  And he had that conversation with Mr. Mazloum

18:17:36   8   and Mr. Mazloum's brother.   And in that conversation

18:17:39   9   Mr. Amawi says to Bilal Mazloum -- this was on, I

18:17:43  10   believe it was April 20, 2005, he tells Bilal Mazloum,

18:17:48  11   You shouldn't have told Amr what we were doing.   I

18:17:51  12   don't trust him about this stuff.   You have to keep it

18:17:54  13   secret from him.   So at the outset of his entry into

18:17:58  14   this conspiracy, Mr. Mazloum has been, in a sense,

18:18:02  15   vetted by Mohammad Amawi.   And more importantly, Your

18:18:05  16   Honor, with respect to Mr. Mazloum, Mr. Mazloum

18:18:08  17   willingly shows up to meet with Darren Griffin.

18:18:11  18              I told you before that there were other

18:18:13  19   individuals that Mohammad Amawi would suggest.   Whether

18:18:16  20   or not Mohammad Amawi ever talked to those people is

18:18:19  21   irrelevant because those people didn't show up.   And so

18:18:23  22   in essence Mohammad Amawi had vetted with Wassim

18:18:27  23   Mazloum, had found him to be a very good candidate for

18:18:30  24   jihad training, and then Wassim Mazloum accepted that

18:18:33  25   offer from Mohammad Amawi.

18:18:41  1      Now, during the first meeting with Darren

18:18:47  2  Griffin, Darren Griffin, Mohammad Amawi, and Wassim

18:18:51  3  Mazloum --

18:18:51  4           THE COURT:  Date?

18:18:54  5           MR. HERDMAN:  November 17, 2004.  Wassim

18:19:02  6  Mazloum is already present at Amawi's house at the point

18:19:04  7  in time that Griffin arrives.  And they're either in

18:19:09  8  the midst of watching videos or they've just recently

18:19:13  9  finished watching a video.  These are jihad-themed

18:19:17  10  videos.  And from the outset of this conversation,

18:19:22  11  you'll remember, Your Honor, that Darren Griffin

18:19:23  12  introduces himself to Mr. Mazloum and explains his

18:19:26  13  background, and from the outset Mr. Mazloum makes it

18:19:31  14  very clear that he is interested in having a goal.  This

18:19:34  15  is not just for fun.  That's a direct quote.  And I,

18:19:38  16  of course, would like to play a few clips.  Not a great

18:19:42  17  length.  I've endeavored to cut these down

18:19:45  18  significantly.  I would ask the Court's indulgence to

18:19:49  19  play a few of these.  This is SM10691852A-1.

18:20:39  20           (Audio played and transcript displayed.)

18:20:45  21           MR. HERDMAN:  And that goal, Your Honor,

18:20:46  22  was, in fact, going to what Mr. Mazloum calls the land

18:20:51  23  of the Army.  I'll play another clip here.

18:21:32  24           (Audio played and transcript displayed.)

18:21:33  25           MR. HERDMAN:  You saw there, Your Honor,

18:21:34 1    that the government has never contended with respect to

18:21:36 2    Mr. Mazloum that he was seeking training so that he

18:21:41 3    could commit any act of violence here in the United

18:21:44 4    States.    That wasn't part of our proof.    It's never

18:21:46 5    been part of the charges that we brought against Mr.

18:21:49 6    Mazloum.    But I would say with respect to Mr. Mazloum

18:21:51 7    that he made it very clear what he wanted to do, and

18:21:55 8    that was to go to Iraq.    And the record is replete with

18:21:59 9    examples of that.    I'll point you to a few of them.

18:22:02 10   But there is no question that Wassim Mazloum was

18:22:05 11   interested in fighting in Iraq.    And that's why he was

18:22:10 12   seeking training.    And the ultimate reason for this, it

18:22:14 13   was not money, it was not fame, it was not glory.    He

18:22:19 14   says very explicitly that he's not seeking an earthly

18:22:23 15   reward for this.    I will play a clip for Your Honor.

18:22:25 16   And I submit to you that by saying this, he is in

18:22:29 17   essence, these are the exact same things you heard from

18:22:33 18   Mohammad Amawi with respect to martyrdom, becoming a

18:22:36 19   shaheed, that this was a religious obligation of some

18:22:41 20   sort.    The perception of Mr. Mazloum is that there is

18:22:44 21   no earthly reward that is ever expected for engaging in

18:22:49 22   jihad.    SM-10 from the sentencing memorandum, the third

18:22:58 23   subclip.    This is SM10-691852A-1.

18:24:43 24               (Audio played and transcript displayed.)

18:24:51 25               MR. HERDMAN:    We don't want no earthly

18:24:53  1  rewards.   No money.    And it's also important to note

18:24:56  2  that during the same meeting on November 17, 2004,

18:24:59  3  Wassim Mazloum himself, just like Mohammad Amawi,

18:25:01  4  offered individuals as recruits.   Wassim Mazloum offers

18:25:04  5  his brother Bilal as a recruit.   And I will remind the

18:25:09  6  Court again that Bilal Mazloum did accompany Darren

18:25:13  7  Griffin, Mohammad Amawi, and Wassim Mazloum on one trip

18:25:17  8  to the shooting range.   And the purpose of this trip

18:25:21  9  was obviously known to Bilal Mazloum because he lied

18:25:26  10  about it to federal agents in February of 2006.   And

18:25:30  11  that was a crime for which he was later convicted of

18:25:33  12  making a false statement.

18:25:40  13         Now, in February of 2005, again, the

18:25:46  14  government does not contend that Darren Griffin at the

18:25:49  15  very least was in contact with Wassim Mazloum --

18:25:52  16         THE COURT:  I didn't hear what you said.

18:25:54  17         MR. HERDMAN:  From November 17 of 2004 until

18:25:56  18  February 16 of 2005, there's no contact between Mr.

18:26:01  19  Mazloum and Mr. Griffin.   And the government didn't

18:26:06  20  contend there was.   But what there is apparently is

18:26:08  21  contact between Mr. Mazloum and Mr. Amawi.   And I would

18:26:14  22  submit to the Court Mr. Amawi is the one who, in

18:26:16  23  essence, arranges for Mr. Mazloum's arrival at all of

18:26:21  24  the meetings to which he eventually shows up.   Darren

18:26:24  25  Griffin does not, for whatever reason that is, does not

18:26:27  1    reach out directly to Mr. Mazloum to arrange for his

18:26:30  2    arrival.   It's always Mr. Amawi who does so.   And I

18:26:34  3    think that's an important point.   It shows again the

18:26:38  4    depth of trust between Mr. Amawi and Mr. Mazloum and the

18:26:41  5    fact that Mr. Mazloum is responsive to requests by Mr.

18:26:44  6    Amawi as opposed to Mr. Griffin.

18:26:49  7            February 16 of 2005, obviously that's the

18:26:53  8    meeting at Marwan El-Hindi's house.   I reference this

18:26:57  9    in the sentencing memorandum.   But from the outset of

18:27:00  10   this meeting, there's no question about what the purpose

18:27:04  11   of this meeting is with respect to Mr. Mazloum.   He,

18:27:07  12   upon crossing the threshold of Mr. El-Hindi's house, the

18:27:11  13   very first topic that they discuss is the availability

18:27:14  14   of jihadist videos on the monitor.   And it doesn't take

18:27:18  15   much more than a hello before they launch into that

18:27:20  16   topic, Your Honor.   And that clip, that reference is

18:27:28  17   28-69185-5A.

18:27:34  18            (Audio is played and transcript displayed.)

18:28:47  19            MR. HERDMAN:   Al-Ansar, I know you remember

18:28:49  20   that particular website.   What's important there is

18:28:53  21   whether Mr. Mazloum is viewing this entirely

18:28:56  22   independently or maybe with assistance from Mohammad

18:28:59  23   Amawi.   He's trying to access these materials just like

18:29:02  24   Mohammad Amawi and just like Marwan El-Hindi.   The fact

18:29:11  25   that this is brought up at the outset of this meeting,

18:29:14    1    there's nothing surprising to Mr. Mazloum about this.

18:29:17    2    In fact, he responds with the name of a jihadist website

18:29:20    3    when prompted by a question from Mr. Griffin.  And

18:29:22    4    again, during this meeting Mr. Mazloum suggests his

18:29:26    5    brother Bilal  as a potential recruit.  And I know that

18:29:30    6    the Court has considered arguments from Mr. Amawi and

18:29:33    7    Mr. El-Hindi with respect to the purpose of training.

18:29:36    8    I believe you rejected them.  The jury rejected those

18:29:38    9    arguments.  I don't anticipate similar arguments from

18:29:42    10    Mr. Helmick or Mr. Doughten.  But this February 16

18:29:46    11    meeting there's no question at this point what these men

18:29:49    12    are talking about and what they intend to do.  And what

18:29:55    13    Wassim Mazloum responds at that point is very important.

18:29:57    14    Because he doesn't run away; he doesn't walk out; he

18:30:01    15    doesn't ask to be left alone.  He actually says to

18:30:06    16    everyone who's assembled that he has two main concerns,

18:30:09    17    and those concerns are security, and learning correctly.

18:30:17    18    I submit to Your Honor when he later expresses what it

18:30:20    19    is he wants to learn, that is explosives.  You can

18:30:23    20    understand why it is he'd want to learn correctly,

18:30:26    21    because a mistake would have deadly consequences.

18:30:40    22    This is another point that I know other

18:30:43    23    counsel tried to make was that Darren Griffin somehow

18:30:45    24    suggested to the defendants where it was that they

18:30:47    25    wanted to go.  I think we've dealt with those arguments

18:30:52  1    separately, but I do want to point out to the Court that

18:30:55  2    there's no equivocation from Wassim Mazloum when he's

18:30:58  3    asked by Darren Griffin where he wants to use this

18:31:00  4    training.   He says, Mainly Iraq and Al-Sham, which was

18:31:04  5    defined as a very broad geographic area.   It doesn't

18:31:08  6    just include Lebanon but --

18:31:10  7                    THE COURT:  How do you.

18:31:12  8                    MR. HERDMAN:  A-l hyphenated S-h-a-m.  I'm

18:31:17  9    going to play that clip for Your Honor.

18:31:42  10                   (Audio played and transcript displayed.)

18:31:50  11                   MR. HERDMAN:  Obviously Iraq came first;

18:31:53  12   thereafter, Al-Sham.   But it's critical.   It's, again,

18:31:58  13   a theme with Mr. Mazloum, that is that Iraq is what he's

18:32:01  14   interested in.   And I know at trial that defense

18:32:05  15   counsel tried to make some alternative arguments.

18:32:08  16   Those were, in effect, rejected by the jury.   I don't

18:32:10  17   think I need to get into them.   But it's clear from the

18:32:13  18   evidence that Mr. Mazloum is deadly serious about going

18:32:16  19   to Iraq.

18:32:20  20                   Now, at the same meeting I think it's

18:32:23  21   important to note that he offered financial support.

18:32:25  22   He expressed an interest in providing financial support

18:32:28  23   to the mujahidin in Iraq.   And whether these are --

18:32:32  24   whether these were insurgents or nationalists or

18:32:36  25   terrorists, the point is, Your Honor, that he's talking

18:32:39   1    about individuals who are killing U.S. soldiers in Iraq,

18:32:42   2    are killing members of the Iraqi Army, police are

18:32:45   3    killing civilians in some instances, and he wants to

18:32:49   4    give money to them.  He even offers his own legitimate

18:32:53   5    car business as a means to move money or even people

18:33:00   6    into Iraq.  So if you think about this man's life, that

18:33:03   7    is he goes to work, he works at a car lot, he's

18:33:09   8    essentially offering up his entire livelihood and

18:33:13   9    wellbeing to this conspiracy.  And I think it's a

18:33:16  10    unique factor amongst these defendants that this Court

18:33:20  11    should consider.

18:33:22  12          And again, Your Honor, the eagerness is very

18:33:25  13    apparent here.  This is the date where Mr. Mazloum says

18:33:31  14    that time is gold.  And again, I referenced this in the

18:33:35  15    memo.  I don't think I need to play the clip.  But he

18:33:38  16    offers to take a vacation day to go train.  He's so

18:33:42  17    eager he's willing to lose money, in essence, to go.  In

18:33:55  18    the car ride home from this meeting, Mr. Mazloum again

18:34:02  19    expresses his desire to, quote, move this up a little

18:34:05  20    bit.  I do want to play that quickly for the Court

18:34:09  21    because even at the end of this meeting when he's on the

18:34:12  22    drive home he's still so enthusiastic that he feels a

18:34:15  23    need to move things along.

18:34:41  24          (Audio played and transcript displayed.)

18:35:23  25          MR. HERDMAN:  Your Honor, I submit that that

18:35:24  1  is -- if that doesn't express this man's intent, that

18:35:27  2  clip, I don't know what does.  He, just like Mohammad

18:35:30  3  Amawi, he needs to get the training before he goes over

18:35:32  4  to Iraq.  And he wants to move this up because he's

18:35:35  5  getting older.

18:35:44  6          Now, I know the Court has expressed specific

18:35:51  7  concerns with Mr. Mazloum.  I plan to address those

18:35:54  8  specifically, but I know one of those was Mr. Mazloum

18:35:57  9  was not -- I believe your recollection was he had not

18:36:00  10  been aggressively seeking out or pushing for certain

18:36:03  11  kinds of training.  I hope I'm providing some context

18:36:07  12  for that as well.

18:36:08  13          THE COURT:  I hear what you said and am

18:36:11  14  persuaded.

18:36:13  15          MR. HERDMAN:  The other issue I want to

18:36:15  16  briefly address is there's this notion of a paint ball

18:36:17  17  set that was never used.  And, of course, we contend it

18:36:20  18  wasn't.  It's still in its bubble wrap when it was

18:36:23  19  seized by the FBI.  But the paint ball training, for

18:36:27  20  whatever reason it never came to fruition.  But Mr.

18:36:30  21  Mazloum was so eager to obtain this particular type of

18:36:34  22  training that he not only purchased a set for himself,

18:36:38  23  which he never used, by the way, and I submit to the

18:36:41  24  Court that the fact that it wasn't used indicates that

18:36:44  25  there was no other purpose for that paint ball set other

18:36:47  1   than training for jihad.  We know there wasn't training

18:36:49  2   for jihad using a paint ball set with Darren Griffin.

18:36:52  3   And obviously Mr. Mazloum bought it, so the fact that he

18:36:56  4   didn't use it indicates he wasn't planning to use it at

18:37:00  5   some sort of fun-world or playhouse or whatever

18:37:04  6   entertainment venues there may be.  That was the sole

18:37:06  7   purpose of him buying that.  More importantly, on April

18:37:09  8   29, 2005, Mr. Mazloum -- again, he's not a man of

18:37:13  9   substantial financial means.  He's already offered

18:37:17  10  money; he's offered his only means of livelihood to the

18:37:22  11  conspiracy.  He offers to buy paint ball sets for his

18:37:24  12  co-conspirators.  That was April 29, 2005.

18:37:34  13          I'd like to speak a little bit, because I

18:37:39  14  know defense counsel will speak a little bit with

18:37:41  15  respect the to history and characteristics of the

18:37:43  16  defendant.  I'm taking a break, I guess, from the

18:37:46  17  chronological review of the case here.  I played a clip

18:37:53  18  where Mr. Mazloum said he felt that the most worthy

18:37:57  19  place was either the fields of jihad or the land of the

18:38:00  20  Army.  Actually, the fields of jihad was a separate

18:38:03  21  clip, but that also was heard on November 17, 2004.

18:38:06  22  That was a fairly memorable quote, I think, Your Honor,

18:38:09  23  so I don't feel the need to replay that clip.  But he

18:38:12  24  made it clear that he thought that that was where this

18:38:15  25  training was most appropriately used.

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
| 18:38:19 | 1  | I'm not going to make a big point out of |
| 18:38:21 | 2  | this.  I think it's important to note that Mr. Helmick |
| 18:38:26 | 3  | or Mr. Doughten will mention the  -- maybe unique to |
| 18:38:27 | 4  | people in Toledo, unfortunately not unique trait that |
| 18:38:31 | 5  | people who grew up in Lebanon in the '80s, for people |
| 18:38:35 | 6  | who grew up in the childhood circumstances of Mr. |
| 18:38:38 | 7  | Mazloum.  The only point I want the Court to consider |
| 18:38:44 | 8  | is, yes, the government concedes that he saw a lot of |
| 18:38:47 | 9  | tragic events.  He was probably very frightened as a |
| 18:38:51 | 10 | child, and he had to move around a lot.  He lived in a |
| 18:38:54 | 11 | basement for a period of time.  But it's important to |
| 18:38:58 | 12 | remember that that childhood trauma was caused by a |
| 18:39:01 | 13 | particular government which was supported by the United |
| 18:39:05 | 14 | States.  That is the Israeli government which was |
| 18:39:08 | 15 | supported by the United States.  And I hope the Court |
| 18:39:10 | 16 | remembers the testimony of his mother talking about the |
| 18:39:13 | 17 | Israeli fighter planes, there were F16s flying over |
| 18:39:16 | 18 | their village in Lebanon, and the fact that everyone |
| 18:39:18 | 19 | knew in Lebanon that Israel was supported by the United |
| 18:39:23 | 20 | States.  So to the extent the Court is going to |
| 18:39:27 | 21 | consider with respect to his upbringing, I would also |
| 18:39:29 | 22 | say to the Court that's motive evidence, and that is |
| 18:39:31 | 23 | also evidence of his intent.  It explains why Mr. |
| 18:39:34 | 24 | Mazloum is so eager and intent on engaging in the kind |
| 18:39:38 | 25 | of behavior that was going on here. |

18:39:44  1          THE COURT:  Well, if defense counsel raises

18:39:49  2   that point, let me say now, whatever may explain

18:39:57  3   something, it doesn't excuse it.

18:39:59  4          MR. HERDMAN:  That's certainly true.

18:40:03  5          THE COURT:  There are probably thousands if

18:40:05  6   not -- maybe tens of thousands of people from the Middle

18:40:10  7   East who have emigrated to this country and that did not

18:40:15  8   take the path that he chose.

18:40:17  9          MR. HERDMAN:  I agree with that assessment,

18:40:20  10  Your Honor.

18:40:21  11          And also Mr. Mazloum is someone who's

18:40:23  12  capable of attending the University of Toledo.  He did

18:40:26  13  attend there as a student.

18:40:29  14          THE COURT:  I think he was a student when he

18:40:31  15  was arrested.

18:40:32  16          MR. HERDMAN:  That's correct.  He also ran

18:40:34  17  his own business.  So this is not someone incapable of

18:40:37  18  supporting himself.  And he had the great -- I'm not

18:40:41  19  sure about this, but I think he had family here that

18:40:44  20  sponsored him for a green card.  So he had really

18:40:48  21  everything he needed to succeed here in Toledo, and

18:40:51  22  instead he chose to engage in criminal conduct that's

18:40:55  23  outlined in this conspiracy.

18:40:58  24          There's another aspect that I think the

18:41:03  25  Court should take into account when dealing with this

18:41:05   1   specific factor, and that is it's quite hard for perhaps

18:41:14   2   someone to understand how Mr. Mazloum became friends

18:41:19   3   with someone like Mohammad Amawi, at least according to

18:41:22   4   what Mr. Amawi said on tapes, but it's very clear they

18:41:27   5   had a very deep relationship, and that relationship has

18:41:29   6   extended to their time in pretrial detention.   Now, I

18:41:33   7   know defense counsel, they mentioned this in their memo,

18:41:36   8   the fact that Mr. Mazloum was released for a period

18:41:39   9   of -- I think it was almost a year.   I'm not positive.

18:41:44  10           MR. HELMICK:  Nine months.

18:41:45  11           MR. HERDMAN:  That was apparently without

18:41:47  12   incident.   But I do think it's important to note for

18:41:49  13   the Court that there are indications that Mr. Mazloum,

18:41:53  14   at least when he's incarcerated, is not willing to

18:41:55  15   follow the regulations of the Bureau of Prisons,

18:41:58  16   especially if it's to help out Mr. Amawi.   And I noted

18:42:02  17   that Mr. Amawi spoke in some sort of a way trying to

18:42:07  18   excuse Mr. Mazloum's participation.   I don't remember

18:42:10  19   the exact quote, but he did speak about him yesterday.

18:42:13  20   And it's clear to me at least looking at some of the

18:42:17  21   conduct here that Mr. Mazloum continues to try to

18:42:20  22   advance the interests of Mr. Amawi.   Now, you notice

18:42:22  23   that Mr. Amawi was on phone restriction for -- it's been

18:42:27  24   several months, if not a year that he's been on phone

18:42:29  25   restriction.   And Amr Amawi yesterday conceded that he

18:42:33   1   received a phone call while he was in Jordan from Wassim

18:42:36   2   Mazloum who relayed information about Mohammad Amawi.

18:42:39   3   He admitted in the phone call he was not supposed to be

18:42:42   4   relaying, but he did anyway.   And there's no other

18:42:45   5   explanation for that phone call than Mr. Mazloum was

18:42:47   6   trying to get either information to Amawi's family,

18:42:50   7   which he did, that he had been moved out of the

18:42:53   8   segregation into general population, and also to get

18:42:56   9   information for Mr. Amawi.   He asks in that phone call,

18:42:59   10  How is everybody?  Is everybody fine?  And if you read

18:43:02   11  just that portion of our sentencing memorandum, Your

18:43:05   12  Honor, it's one paragraph, it sets out the fact that Mr.

18:43:08   13  Mazloum knew he was circumventing Bureau of Prisons

18:43:11   14  regulations to make this phone call.   He lied to the

18:43:14   15  guard that was monitoring the phone call so he could

18:43:16   16  make the call, and he even used in some -- he referenced

18:43:21   17  Malik.   I believe Malik is the older brother.   When he

18:43:24   18  spoke of Mr. Zaki Amawi, he said, oh, how is Malik's

18:43:28   19  father?  How are you?  So it certainly doesn't approach

18:43:34   20  at all the extent of the conduct of Mr. Amawi, but it is

18:43:37   21  an important fact, and it's not one that we would want

18:43:41   22  to go unconsidered by the Court.

18:43:46   23          I'll get to the last set of factors.   I

18:43:49   24  would put these together.   Really they spill over in

18:43:52   25  all the evidence, the factors of sentencing, and that is

18:43:58  1   the specific deterrence to Mr. Mazloum as well as

18:44:01  2   protecting the public from further crimes of the

18:44:03  3   defendant.

18:44:05  4            THE COURT:  As I sit here I am more

18:44:07  5   concerned about the need for, in addition to the

18:44:12  6   overarching public deterrence, specific deterrence.   I

18:44:16  7   believe I indicated briefly sometime this morning that

18:44:22  8   one of my concerns with Mr. Mazloum, in light of some of

18:44:24  9   the things that you've referenced, is that he's subject

18:44:28  10  to deportation, would essentially get a ticket to the

18:44:37  11  Middle East.  And if he were not deterred as a result of

18:44:42  12  the sentence in this case, he might well be inclined to

18:44:48  13  pick up where he was interrupted.

18:44:53  14            MR. HERDMAN:  And that's certainly the

18:44:56  15  government's assessment as well, Your Honor.  I did not

18:44:58  16  make reference to the fact he's facing certain

18:45:00  17  deportation in our memo.  I felt it would be

18:45:02  18  inappropriate to raise that issue.

18:45:05  19            THE COURT:  I disagree.  I think, as I

18:45:06  20  said, with regard to the other two defendants, one of

18:45:09  21  the reasons that I have expressed the degree of

18:45:17  22  confidence I have, not absolute because one can never be

18:45:21  23  certain, but that protection of the public in my view,

18:45:25  24  in light of the sentences that gave, can be accommodated

18:45:29  25  adequately by lifetime supervised release.  Well,

18:45:36  1   that's not available here.

18:45:39  2              MR. HERDMAN:  The only thing I would say is

18:45:41  3   defense counsel raises it in their memo, so I feel

18:45:44  4   it's -- for what it's worth, if it's an issue, it's been

18:45:48  5   put in play by the defense.  And my assessment is the

18:45:51  6   same as Your Honor's, which is by acknowledging the fact

18:45:54  7   that he's certain deportation, what we are in essence

18:46:00  8   doing -- I see he's got a significant amount of family

18:46:02  9   here.  I know most of them are U.S. citizens.  There

18:46:06  10  was also testimony at the trial about the military

18:46:08  11  requirement if you go overseas to Lebanon.  I don't know

18:46:13  12  how many male members of his family are here.  I don't

18:46:15  13  know how many of them are dual citizens.  I don't know

18:46:18  14  how many of them are purely Lebanese citizens.  I think

18:46:22  15  the testimony will show Mr. Mazloum was subject to a

18:46:25  16  military requirement if he went back to Lebanon.  To

18:46:29  17  the extent that's important, his whole network is here

18:46:32  18  in Toledo.  I'm sure he still has family in Lebanon,

18:46:36  19  but I think his immediate family is all here in Toledo.

18:46:39  20             THE COURT:  The ones who matter most will be

18:46:41  21  here.

18:46:41  22             MR. HERDMAN:  And I think it's unlikely that

18:46:43  23  they would -- I don't think Mr. Helmick or Doughten will

18:46:47  24  answer it, but I think it's unlikely they would choose

18:46:50  25  to uproot themselves and move back to Lebanon should he

18:46:54   1   be deported.  So his whole network is here.   His means

18:46:59   2   of livelihood were here.   The fact he was studying to

18:47:02   3   be a student are here.   And what's back in Lebanon?

18:47:04   4   Well, it's a war-torn country, there's constant strife,

18:47:07   5   and he is going to be put in a position where he's

18:47:11   6   closer to U.S. military members who are serving in Iraq,

18:47:14   7   however long that may be, but presumably for at least

18:47:19   8   the next -- the near future there will be troops in the

18:47:23   9   Middle East on behalf of the United States, whether

18:47:26  10   they're in Iraq or somewhere else, they will be there.

18:47:28  11   And he's, in essence, being uprooted, fully uprooted,

18:47:32  12   placed back into a highly volatile situation, and he's

18:47:39  13   already expressed an intent to do what it is this Court

18:47:42  14   fears he's going to do, which is kill people.   He's

18:47:45  15   made it very clear that he has an interpretation of this

18:47:49  16   obligation that gives him -- he doesn't need money.

18:47:52  17   All he needs -- he doesn't need any earthly reward.   And

18:47:55  18   by inference what he's talking about is martyrdom.   And

18:47:59  19   he's explained where that jihad is taking place; it's

18:48:02  20   taking place in Al-Sham, which includes Lebanon.   It's

18:48:07  21   taking place in Iraq.

18:48:08  22           And I do have a few more clips I want to

18:48:12  23   play just to make it clear, the deadly seriousness that

18:48:17  24   Mr. Mazloum approached this training.

18:48:19  25           I know you also have an issue about his lack

18:48:21  1    of participation, if you will, later on in the case.

18:48:24  2          THE COURT:  Or at least apparent.  Again,

18:48:29  3    it's my recollection that I think Mr. Griffin was

18:48:31  4    encouraging Amawi to reach out to him, and where's

18:48:36  5    Wassim, and so forth.

18:48:38  6          MR. HERDMAN:  Actually, I don't have

18:48:39  7    specific clips that would address that concern, but the

18:48:41  8    way I remember that is most of the conversation about

18:48:43  9    Mr. Mazloum took place while he was, in effect, actually

18:48:47  10   engaged in the training.  That is there would be a

18:48:50  11   meeting maybe two days before shooting, and Wassim's

18:48:53  12   name would be brought up either by Mr. Griffin or Mr.

18:48:55  13   Amawi:  Is he going to be in?  Is he going to show up?

18:48:59  14   And they may have mentioned him afterward.  But that's

18:49:02  15   the way I recall.

18:49:03  16         THE COURT:  Maybe there's some delay in

18:49:06  17   getting out to the range because of the difficulties,

18:49:10  18   work or whatever.

18:49:11  19         MR. HERDMAN:  That did happen.  And, in

18:49:13  20   fact, on February 16, Mr. Mazloum is the one who seems a

18:49:17  21   little upset with the fact -- I wouldn't go so far as to

18:49:22  22   say upset; I would say disappointed with the fact that

18:49:24  23   they're not training, they're not actively doing

18:49:28  24   anything, just according to him going to Marwan's house,

18:49:31  25   and he seems a little surprised by that.  I hope the

18:49:34  1     Court recollects that.

18:49:35  2             But on February 16, there's a conversation

18:49:40  3     that's going on.  Mr. El-Hindi is talking about sniper

18:49:44  4     attacks against the U.S. military, talking about how

18:49:48  5     afraid that makes the U.S. military, these sniper

18:49:51  6     attacks.  And Mr. Mazloum starts a new conversation

18:49:53  7     with Darren Griffin.  And he asks about manufacturing

18:49:56  8     bombs out of essentially household ingredients, kitchen

18:50:01  9     supplies.  I'd like to play that for the Court.

18:50:06  10            (Audio played and transcript displayed.)

18:51:06  11            MR. HERDMAN:  And, Your Honor, that --

18:51:08  12    obviously Mr. Mazloum, you heard him say "sugar" there.

18:51:11  13    You heard him say sugar as a potential ingredient.

18:51:15  14    He's obviously heard that somewhere; he knows it's

18:51:18  15    possible to do this.  I won't stand here and say

18:51:20  16    whether that is possible.  I know it's quite common

18:51:23  17    that certain baking ingredients are used in explosives.

18:51:26  18    I know this came up yesterday in the video of the

18:51:29  19    individual, I believe it was in Denver, shopping for

18:51:32  20    beauty products essentially.  So I think it's

18:51:36  21    well-known that there are ways to make explosives using

18:51:39  22    household ingredients.  And in the context of the

18:51:41  23    conversation about snipers, Mr. Mazloum wants to know

18:51:44  24    how to make bombs.

18:51:48  25            And that wasn't the only time that he

| | | |
|---|---|---|
| 18:51:49 | 1 | referenced building explosives.  There was another |
| 18:51:53 | 2 | conversation at Darren Griffin's house or his apartment, |
| 18:51:56 | 3 | I believe.  I think that was April 13 -- April 20. |
| 18:52:05 | 4 | There was a meeting at Darren Griffin's house between |
| 18:52:09 | 5 | Mr. Amawi, Mr. Mazloum, and Mr. Griffin.  And this is |
| 18:52:12 | 6 | an instance where they learn how to site a handgun. |
| 18:52:20 | 7 | And during this conversation -- |
| 18:52:21 | 8 | THE COURT:  When was that meeting again? |
| 18:52:23 | 9 | MR. HERDMAN:  April 20, 2005. |
| 18:52:25 | 10 | THE COURT:  Where was it? |
| 18:52:27 | 11 | MR. HERDMAN:  It was at Mr. Griffin's |
| 18:52:29 | 12 | apartment. |
| 18:52:30 | 13 | THE COURT:  Who all was there; Amawi, |
| 18:52:33 | 14 | Mazloum, and Griffin? |
| 18:52:34 | 15 | MR. HERDMAN:  Yes.  It was -- and just for |
| 18:52:36 | 16 | the record, this is SM -- I apologize, Your Honor, that |
| 18:52:42 | 17 | was April 13, 2005. |
| 18:52:47 | 18 | THE COURT:  April 13 -- |
| 18:52:50 | 19 | MR. HERDMAN:  2005.  Yes.  I was right the |
| 18:52:52 | 20 | first time.  This is SM58691853A-5.  It's also page 57 |
| 18:53:03 | 21 | of the government's sentencing memorandum. |
| 18:53:57 | 22 | (Audio played and transcript displayed.) |
| 18:54:12 | 23 | MR. HERDMAN:  Admittedly, he didn't know |
| 18:54:15 | 24 | what an IED is. |
| 18:54:17 | 25 | THE COURT:  Well, he was told. |

18:54:18   1              MR. BAUER:  Once he's told, he says, Oh,

18:54:20   2    that's the most important thing.   We have to learn

18:54:22   3    that, and ambushes too.

18:54:28   4              Now on page 58 of the government's

18:54:30   5    sentencing memorandum, I just wanted to lay out for the

18:54:34   6    Court again the number of times that Wassim Mazloum

18:54:36   7    mentions Iraq.   This is the place that he talks about

18:54:41   8    when he talks about fighting, when he talks about

18:54:43   9    getting training for jihad, when he talks about engaging

18:54:47  10    in military action.   And he's very -- he realizes the

18:54:53  11    importance of developing connections in Iraq.   I don't

18:54:56  12    know if Your Honor recollects, but there's a point in

18:54:59  13    time where Darren Griffin basically says, Well, we'll

18:55:02  14    just go over there, and if we get captured -- not one of

18:55:05  15    his finer moments as a source for the government.   Mr.

18:55:09  16    Griffin says, If we go over there and get captured by

18:55:14  17    Zarqawi, we'll have them call back to the U.S., and they

18:55:16  18    can vouch for us.   And Mr. Mazloum and Mr. Amawi say,

18:55:19  19    That's a pretty preposterous idea because they're not

18:55:23  20    going to know who you are if they call the law in

18:55:25  21    Toledo.  So Mazloum recognizes the importance of these

18:55:33  22    connections.   They're not connections for legitimate

18:55:35  23    business purposes; they're connections to the mujahidin,

18:55:38  24    as he puts it.

18:55:41  25              I just want to play two clips that occurred

18:55:44  1   sort of during the more active part of his training.

18:55:48  2   One of them is from February 16 of 2005 at Marwan

18:55:52  3   El-Hindi's house.    This is SM286918519A-3.

18:58:48  4              (Audio played and transcript displayed.)

18:58:49  5              MR. HERDMAN:   Two months later again on

18:58:52  6   April 20 Mazloum again talks about the importance of

18:58:56  7   these connections.    This is SM4869185-3A-3.

18:59:09  8              (Transcript displayed.)

18:59:21  9              MR. HERDMAN:   There doesn't appear to be

18:59:23  10  audio.

19:00:42  11             MR. HERDMAN:   There, Your Honor, that's Mr.

19:00:44  12  Amawi talking about his -- the Syrian connection for

19:00:48  13  Astrolite with Darren Griffin.    And Wassim Mazloum's

19:00:51  14  listening in on this.   And he says -- remember what

19:00:53  15  happens; We need to stay in contact with these people

19:00:55  16  because these are the real connections, as far as he can

19:00:58  17  tell just based on this little conversation.

19:01:01  18             And I remind the Court also that the next

19:01:04  19  day or two following that conversation Mr. Griffin asks

19:01:08  20  Mr. Amawi, Should I not have brought it up in front of

19:01:13  21  Wassim?  And Mr. Amawi says, No, no, it's fine.    Don't

19:01:16  22  worry about it.   He's trusted.    So again demonstrating

19:01:21  23  the importance that he acknowledges, much more so than

19:01:24  24  Mr. Griffin does, the importance of connections to get

19:01:26  25  into Iraq.

19:01:27   1          And this leads me to what I know the Court
19:01:30   2   has already raised as something that you're considering,
19:01:33   3   which is the fact that as an active participant, at
19:01:39   4   least in some of the training here, Wassim Mazloum does
19:01:43   5   not make a reappearance after April 29, 2005.   There is
19:01:47   6   one reappearance which I'll talk about in connections in
19:01:52   7   Iraq, but I think it's important to note a few things.
19:01:54   8   Again, it's speculation for the government to try to
19:01:57   9   endeavor what he was thinking at this point in time.
19:02:00  10   But I would just throw a few things out for the Court
19:02:04  11   that I know were developed in the evidence at trial.
19:02:06  12          One of the most important things that I'll
19:02:08  13   try to set out here is Mr. Mazloum was very, very, very
19:02:11  14   eager to start this training.   He wanted to get going.
19:02:13  15   And as the Court knows very well, that is something that
19:02:16  16   Mr. Griffin was not going to be able to do.   He was not
19:02:19  17   going to be able to provide training in explosives.   He
19:02:22  18   was not going to be able to teach Mr. Mazloum how to
19:02:27  19   conduct an ambush with explosive devices.   And Mr.
19:02:30  20   Mazloum himself expressed frustration with this.   So in
19:02:34  21   essence he may -- and keep in mind, Your Honor, the
19:02:38  22   conversation about the connection -- his connections in
19:02:42  23   Iraq.   Maybe Mr. Mazloum figured the utility of Mr.
19:02:45  24   Griffin was limited in some way.   But more importantly,
19:02:47  25   and I think some of that was definitely developed at

19:02:50  1    trial, is that Mr. Mazloum had a pending naturalization

19:02:54  2    application at this point in time.   That was a

19:02:56  3    naturalization granted in the summer of 2005 to his

19:03:00  4    mother and his brother.   And it's quite likely that Mr.

19:03:07  5    Mazloum looked at the situation that he was in and

19:03:10  6    decided that it probably wasn't worth risking getting

19:03:14  7    his naturalization in this jihad training until he

19:03:18  8    received it.   His family received it in the summer of

19:03:22  9    2005.   So it's not impossible that he would be able to

19:03:24  10   restart, reset the training after he received his

19:03:27  11   citizenship.   And the fact that Wassim Mazloum knew

19:03:30  12   that he could get in trouble for this was very apparent

19:03:35  13   because one of the very first meetings, I believe

19:03:38  14   November 17, 2004, he said, Well, if we go out in the

19:03:41  15   woods to train, we should carry other weapons, hunting

19:03:44  16   weapons, in case somebody stops us so we can tell them

19:03:47  17   we're just out there hunting so we'll have, in essence,

19:03:50  18   a cover as to why we're out there in the woods training.

19:03:53  19   So he knew that he could get in trouble for this.   And

19:03:57  20   he probably did not want to jeopardize his pending

19:04:01  21   naturalization application.   That's speculation.   But

19:04:03  22   what is important and what I do want to draw the Court's

19:04:06  23   attention to --

19:04:07  24            THE COURT:   I wouldn't say it's entirely

19:04:08  25   speculation.   You pointed to facts in the record that

19:04:11 1    support that inference as an explanation for his

19:04:18 2    apparent turning of his back.

19:04:22 3              MR. HERDMAN:  But despite all of that, Your

19:04:24 4    Honor, in September of 2005, Darren Griffin -- now, he

19:04:29 5    does go to -- he does go to Mr. Mazloum.  But this is

19:04:32 6    after Mr. Griffin has returned from Jordan.

19:04:37 7              If I may back up for just a moment.  There

19:04:40 8    is one other point.  I know the Court knows this, but

19:04:44 9    mention had been made at other times that the focus of

19:04:47 10   the investigation took a somewhat different turn in

19:04:51 11   April/May of 2005 with the potential developing of the

19:04:59 12   overseas contacts of Mohammad Amawi.  And really at

19:05:01 13   that point in time, if you look at Marwan El-Hindi's

19:05:05 14   active participation, Wassim Mazloum's, the focus of the

19:05:09 15   investigation was clearly on Mr. Amawi at that point in

19:05:12 16   time.  I know you know that.  I just wanted to make

19:05:14 17   sure the record is clear on that for a potential

19:05:18 18   explanation for why there was no contact.

19:05:21 19             But in September of 2005 after he gets back

19:05:23 20   from Jordan, Mr. Griffin goes to Mr. Mazloum's car

19:05:27 21   dealership, and they have a conversation.  And I think

19:05:31 22   this conversation is very revealing, Your Honor.  I

19:05:34 23   know I mentioned it before, but I think if you look at

19:05:37 24   the substance of this conversation, it's clear that the

19:05:39 25   desire to go to Iraq and to develop connections with the

19:05:42  1   Mujahidin still remains with Mr. Mazloum.   And this

19:05:45  2   clip is -- it's from September 29, 2005.   And this clip

19:05:56  3   is 103-69185-2A.

19:07:23  4                (Audio played and transcript displayed.)

19:07:25  5                MR. HERDMAN:  Again, this is Mr. Griffin

19:07:27  6   completely misunderstands what it is that Mr. Mazloum is

19:07:31  7   asking about.  He thinks he's talking about getting cars

19:07:34  8   overseas.   That's why he s saying 2004s or '5s?  Mr.

19:07:39  9   Mazloum says, Cars?   I'm not talking about cars.   I'm

19:07:42  10  talking about the mujahidin.   And he knows he just got

19:07:46  11  back from Jordan.   So it's clear he wants to find out

19:07:49  12  if there's any legitimate connections.   Again, that's

19:07:52  13  his concern.

19:07:53  14                There was additional contact in January of

19:07:56  15  2006 between Mr. Griffin and Mr. Mazloum, and that one

19:08:02  16  again references Iraq.   I won't play it for the Court,

19:08:04  17  but it's referenced in our memorandum.

19:08:06  18                And I guess to sum up, Your Honor, this is

19:08:13  19  not some sort of fleeting participation in the

19:08:18  20  conspiracy.   I know you made a finding last week for

19:08:22  21  Mr. Mazloum.  To the extent that we haven't objected

19:08:27  22  already, we would object to that.

19:08:30  23                THE COURT:  I don't think much of this was

19:08:33  24  called to my attention, but go ahead.

19:08:35  25                MR. HERDMAN:  And that may be true.   To the

19:08:37  1   extent that it wasn't, that's certainly our fault.

19:08:45  2          THE COURT:  I think what you're saying is he

19:08:47  3   had an intense interest to be trained in very dangerous

19:08:52  4   techniques.

19:08:52  5          MR. HERDMAN:  Correct.

19:08:54  6          THE COURT:  Particularly bomb making and

19:08:57  7   placement.

19:08:58  8          MR. HERDMAN:  Yes, Your Honor.

19:09:00  9          THE COURT:  Particularly in Iraq.

19:09:02  10          MR. HERDMAN:  Yes.

19:09:03  11          THE COURT:  And that his lack of engagement

19:09:10  12   with either Amawi or Griffin might be attributable to

19:09:17  13   the fact he had a pending naturalization application.

19:09:21  14          MR. HERDMAN:  Yes.

19:09:22  15          THE COURT:  That doesn't mean that his

19:09:24  16   interest and ultimate desire had waned at all.   In

19:09:28  17   fact, I assume you would suggest that the most that can

19:09:34  18   be deduced might be that it was status quo.   There's

19:09:38  19   certainly nothing in the record with reference to him

19:09:47  20   that shows his interest had indeed waned or his desires

19:09:51  21   had been abandoned.

19:09:53  22          MR. HERDMAN:   That's correct, Your Honor.

19:09:55  23   And what I would say is that although his contacts with

19:09:58  24   Mr. Griffin may have been few, or at least fewer than

19:10:03  25   his co-conspirator, they were of such a nature and of

19:10:07  1  such a serious purpose that they evinced really a

19:10:12  2  profound concern for any sentence that substantially

19:10:18  3  varies from life.   And I know Your Honor is going to

19:10:21  4  vary from a life sentence.   But obviously that's what

19:10:24  5  we're asking for.   And I'm not going to suggest some

19:10:27  6  alternative sentence at this point.   But in Mr.

19:10:32  7  Mazloum, he is unique among his co-conspirators in the

19:10:36  8  sense he's not a citizen, and he is removable.   But

19:10:40  9  that is a fact -- and the Court's already expressed

19:10:43  10  this.   I think it just goes to putting him closer to a

19:10:46  11  place where he can put people in immediate peril.   And

19:10:49  12  Mr. Mazloum made no secret of the fact he wanted to

19:10:53  13  engage in jihad, he wanted to kill people, how he wanted

19:10:57  14  to kill them and where he wanted to kill them.   And for

19:10:59  15  those reasons he was convicted of the crimes he was

19:11:02  16  charged with.   And I submit to Your Honor that he

19:11:04  17  should receive a very substantial sentence as a result

19:11:08  18  for all the factors that are outlined in 18 U.S.C.

19:11:14  19  3553.

19:11:18  20          THE COURT:  Mr. Helmick.

19:11:20  21          MR. HELMICK:  Your Honor, is there a

19:11:21  22  particular place you'd like me to begin?

19:11:33  23          Judge, I had kind of approached -- we had

19:11:37  24  kind of approached the sentencing without necessarily

19:11:39  25  relitigating issues for trial.   I understand that the

19:11:42  1   government's point or focus is to try to say these are

19:11:45  2   issues that we think bear on aggravation or mitigation

19:11:48  3   with regard to a sentence.   Nevertheless, Judge, I

19:11:52  4   don't want to get into a tit-for-tat on every issue and

19:11:56  5   point that's been raised by the government that occurred

19:12:00  6   during the period from November 2004 to April of 2005.

19:12:04  7   The evidence is what it is.   I heard it last year.

19:12:08  8   You did too, and so did the jury.

19:12:11  9          I guess a few things, though, I would like

19:12:14  10  to touch on or clarify to the Judge.   There was

19:12:17  11  evidence in the record to indicate that some of this

19:12:20  12  issue of eagerness or earnestness or energeticness,

19:12:25  13  which of course the jury didn't find, they found a

19:12:28  14  willing joinder participation in a criminal conspiracy

19:12:33  15  and acts in furtherance of that conspiracy.   That may

19:12:36  16  be an inference that the government wants to draw and

19:12:38  17  argue, but it's, of course, not what they found.   But

19:12:43  18  during this period of time you might remember the

19:12:46  19  Mazloum family.   And there was testimony about this at,

19:12:51  20  I believe, the bond hearing and certainly during the

19:12:53  21  defendant's case in chief during the trial, that there

19:12:56  22  was a planned family trip to Lebanon, and possibly for

19:13:01  23  an arranged marriage.   This is not relitigating the

19:13:04  24  case; in fact, this is not inconsistent with the jury's

19:13:07  25  verdict, Judge.   If I might just elaborate.   There was

19:13:10 1   a planned trip perhaps for that summer of 2005.   There
19:13:14 2   was still existing at that time a mandatory military
19:13:17 3   service requirement for Mr. Mazloum based on his age and
19:13:21 4   his status as a Lebanese national at that time.   And
19:13:25 5   there is evidence in the record to indicate that he
19:13:29 6   might be returning home and that he might be serving,
19:13:35 7   not voluntarily, in the Lebanese Army for a period of
19:13:38 8   six months.   In fact, there were tapes played that
19:13:41 9   indicated some discussion of that.   And I am not,
19:13:44 10  Judge, trying to relitigate here that that was his only
19:13:46 11  purpose in training and so forth.   That was for the
19:13:51 12  jury to decide.   They made their decision at least a
19:13:54 13  purpose or primary purpose was an unlawful purpose, not
19:13:58 14  a purpose of training for Lebanon.   Nevertheless, the
19:14:02 15  timing, Judge, is that he was planning on this trip to
19:14:04 16  go to Lebanon with his family that summer, and military
19:14:08 17  service still hung out there as a possibility.   And he
19:14:13 18  talks about trying to learn here before he goes there --
19:14:15 19  not Iraq, Lebanon -- when he goes there for a period of
19:14:20 20  military service.
19:14:21 21          Here's what changed, Judge.   Sometime in
19:14:24 22  April or May, he got back on the right path from
19:14:28 23  whatever happened or what he had done before then.   And
19:14:34 24  there's a number of ways we know that happened.   After
19:14:36 25  that second trip to the shooting range on April 29,

19:14:40   1   2005, which was the last time that he went, and, in

19:14:44   2   fact, the last time that he saw Darren Griffin except

19:14:47   3   for Darren Griffin showing up twice at his place of

19:14:50   4   business at the car lot -- which I'll get to in a little

19:14:53   5   bit here -- at that time he was -- Judge, he was out.

19:14:59   6   Maybe forget legal withdrawal.  Again, I'm not trying

19:15:03   7   to relitigate the case.  But for mitigation purposes,

19:15:06   8   this makes a different to you for his intent, his life

19:15:09   9   choices and how you perceive him to be a threat or his

19:15:12   10  future dangerousness.  I submit to the Court that if

19:15:15   11  you look at everything in toto, a fair assessment is

19:15:19   12  that he left whatever it was that the jury found that he

19:15:24   13  did, he got out of.

19:15:26   14          And on May 18 of '05, Judge, there was an

19:15:31   15  important discussion as it concerns him and intent

19:15:35   16  between Mr. Amawi and Mr. Griffin.  And Mr. Amawi

19:15:39   17  expresses his desire to move forward without Wassim,

19:15:46   18  without Mr. Mazloum.  Mr. Griffin comments on how Wassim

19:15:50   19  will not call him back or return his calls, and that

19:15:55   20  they really need committed brothers; the suggestion

19:15:58   21  being he doesn't have the commitment.  That's for Mr.

19:16:01   22  Griffin and his discussion with Mr. Amawi on May 18.

19:16:05   23  And, in fact, Judge, we have no documented contact

19:16:10   24  between Mr. Griffin and Mr. Mazloum or any acts in

19:16:15   25  furtherance of any training or other purpose at all

19:16:19  1    throughout the balance of the case.   In fact, the next

19:16:24  2    documented contact with Mr. Griffin is not until the one

19:16:27  3    that Mr. Herdman referred to on September 29, 2005.   At

19:16:33  4    that time, Judge -- and you may remember that

19:16:35  5    recording -- Mr. Griffin shows up uninvited, unannounced

19:16:42  6    at the car lot.   And by this time Wassim had been

19:16:44  7    previously working at his uncle's car lot but had now

19:16:49  8    opened his own without telling Mr. Griffin.   There's no

19:16:53  9    evidence of that, but Mr. Griffin tracked him down

19:16:55  10   anyway and showed up.   It's clear from the context of

19:16:58  11   that conversation that they have had no contact.   There

19:17:02  12   may be a comment of some sort from Mr. Griffin like,

19:17:05  13   You're a busy man, you know, Judge, which I think leads

19:17:09  14   to a permissible inference that, jeez, I haven't been

19:17:12  15   able to get a hold of you or track you down.

19:17:16  16            At that September 29, 2005 meeting, Judge,

19:17:18  17   Mr. Griffin announces that he and his family are moving

19:17:23  18   to Jordan.   That, of course, wasn't true, but Mr.

19:17:26  19   Mazloum didn't know that.   And Mr. Mazloum's reaction

19:17:30  20   is instructive, which is, Oh, good for you.

19:17:33  21   Congratulations.   You'll have trouble at first because

19:17:36  22   of the language barrier when you go over there.   But,

19:17:40  23   Judge, notably it's not, well, who's going to resume my

19:17:43  24   training when you leave?  Or, How can you abandon me if

19:17:47  25   I want to resume my training or continue my training

19:17:49   1   with you?  There's no such reference.  Nor is there
19:17:52   2   anything about, After you get settled, I'll come to
19:17:56   3   Jordan and visit you, and we can resume training and our
19:17:59   4   plans together.  There's nothing of the sort.  It's
19:18:02   5   casual conversation in that sense.  And Mr. Mazloum
19:18:08   6   doesn't appear the least bit alarmed, although you can
19:18:12   7   certainly tell there might be some level of discomfort
19:18:15   8   with Mr. Griffin's arrival and discussion while they're
19:18:19   9   there at the car lot that day.  But other than the
19:18:24   10  assertion that he inquires about the brothers overseas
19:18:28   11  of the mujahidin, which I suggest to the Court is
19:18:30   12  frankly just a relevant frame of reference that he had
19:18:34   13  with Mr. Griffin in terms of prior contact.  They're not
19:18:38   14  together because they played soccer together.  They're
19:18:41   15  together because Mr. Griffin was trying to get the
19:18:45   16  recruit or bring people together in the cell previously.
19:18:49   17  That's the relevance of the contact.  That's what Mr.
19:18:52   18  Griffin was pushing, what he was selling.  After that
19:18:55   19  meeting, Judge, there's no more contact between the two
19:18:58   20  of them until January 30, 2006.  And again, there's an
19:19:04   21  uninvited, unannounced -- this is what the Court was
19:19:07   22  remembering from the evidence or perhaps our argument
19:19:10   23  previously.  There's another uninvited, unannounced
19:19:14   24  visit to the car lot on January 30, 2006.  At that
19:19:19   25  point Mr. Mazloum is apparently surprised to see Mr.

19:19:23  1   Griffin because he thought he had moved to Jordan like

19:19:25  2   he had announced last September.   But at any rate, Your

19:19:29  3   Honor, there's no sale on behalf of Mr. Mazloum.   He's

19:19:33  4   not interested in joining up with Mr. Griffin.   He's

19:19:36  5   not interested in moving abroad or overseas.   During

19:19:39  6   the earlier visit, Your Honor, in September, Mr. Griffin

19:19:42  7   didn't even know that Mr. Mazloum was a student, that he

19:19:46  8   had reenrolled at the University of Toledo, that he had

19:19:49  9   completed maybe roughly four years of course work in

19:19:53  10  engineering programming and computer science.   He

19:19:56  11  expressed a surprise of what his major is and what he's

19:20:00  12  doing.   And by January, Wassim is maybe one semester

19:20:03  13  short after that of being able to join up or being able

19:20:07  14  to complete his course work, his bachelor's in

19:20:11  15  engineering and computer science.   From all

19:20:14  16  appearances, Judge, this man has been a source of

19:20:17  17  support to his family since the age of 12 or so when his

19:20:20  18  father abandoned them.   He's taken care of his family

19:20:24  19  at home like he has previously, like he has since he was

19:20:27  20  a young man.   And he's working at the car lot.   And

19:20:30  21  he's trying to complete a rigorous engineering program

19:20:33  22  at the same time.   Does this sound like somebody that

19:20:36  23  poses a future threat?   Does this sound like somebody

19:20:38  24  who's still engaged or interested in being engaged with

19:20:43  25  someone like Darren Griffin?

19:20:44   1          And as for Mohammad Amawi, Your Honor, some

19:20:47   2   of the indication with regard to contact there, they

19:20:49   3   have known each other for a long time.  I believe

19:20:52   4   there's evidence in the record to suggest they met in

19:20:55   5   2000 or 2001 after Mr. Mazloum arrived here.   Maybe

19:20:59   6   first at the Mosque, and also through soccer for a

19:21:03   7   period of time.   He became friends with Mohammad Amawi,

19:21:06   8   obviously.   He also became friends with his family,

19:21:09   9   Judge; with his brother who testified here yesterday on

19:21:11  10   behalf of Mr. Amawi, and with his mother as well.

19:21:16  11          I don't know of what importance the Court

19:21:19  12   places in the August, 2009 phone call by Mr. Mazloum to

19:21:23  13   Mr. Amawi's family in Jordan.

19:21:25  14          THE COURT:  I don't think it's any evidence

19:21:27  15   of some sort of ongoing conspiracy or whatever.   It was

19:21:37  16   something he shouldn't have done.  A bit of his

19:21:44  17   willingness to take risks.   My understanding, you're on

19:21:49  18   full notice they may be monitored and listened to.

19:21:52  19   There are signs right next to the phones.

19:21:55  20          MR. HELMICK:  I understand, Your Honor, and

19:21:56  21   I have the transcript if the Court would like to review

19:21:59  22   it.   It's short and quick.   But I don't think it's

19:22:01  23   nearly as nafarious as the government has portrayed in

19:22:04  24   terms of what was -- and the other thing the Court

19:22:07  25   should be aware of, Judge, is about two and what half

19:22:10  1  months ago, it was -- he wasn't cited by the BOP for any

19:22:15  2  infraction, and no privileges have been restricted on

19:22:18  3  his part.   And he says twice during the conversation

19:22:21  4  with Mr. Amawi's family, I can't tell you about that or

19:22:23  5  talk about him because that's against BOP rules.   Now,

19:22:26  6  the government's suggesting that the very mention of the

19:22:29  7  fact that Mr. Amawi's in general population in his

19:22:34  8  unit --

19:22:34  9          THE COURT:  I understand.   It's a checkmark

19:22:37  10  on the wrong side of the letter, but it doesn't add a

19:22:42  11  great deal.

19:22:43  12          MR. HELMICK:  Very well.   Judge, I don't

19:22:45  13  want to dissect a lot of the evidence during that period

19:22:48  14  of November, 2004 to April, 2005.   Just a couple of

19:22:51  15  things I think to point out that are kind of important.

19:22:54  16          There was a clip played by Mr. Herdman from

19:22:57  17  February 16, 2005 of the dinner meeting where there's

19:23:02  18  mention of jihadist videos, and the Ansar website is

19:23:06  19  mentioned.   I thought we had brought this to the

19:23:09  20  government's attention previously, Your Honor, at trial.

19:23:12  21  But the Ansar website suggestion was made on the tape,

19:23:16  22  that's Mr. El-Hindi's voice, not Mr. Mazloum's.   And I

19:23:21  23  guess I'd like some resolution of that by the Court if

19:23:26  24  the Court deems that appropriate.   And here's where I'm

19:23:31  25  going with this, Judge.   There was a lot of talk about

19:23:34  1   websites and jihadist videos and other things that were

19:23:37  2   played, but conspicuously absent was anything connected

19:23:41  3   to Mr. Mazloum.    There was no computer seized, and

19:23:44  4   there was no forensic evidence from the other

19:23:48  5   defendants' computers to lead or suggest in any way that

19:23:52  6   he was a participant in chatting or websites or

19:23:55  7   downloading or distribution of videos.    And, in fact,

19:23:58  8   Your Honor, from the photographs that were taken and

19:24:03  9   introduced in evidence here regarding his arrest at his

19:24:06  10  mother's home at that time, there is a computer present

19:24:09  11  in the home that's depicted in the photographs that was

19:24:12  12  not seized by the government.    Now, I think they're

19:24:15  13  very good at their jobs.    They didn't miss anything.

19:24:18  14  They didn't take it, and there's a reason they didn't

19:24:20  15  take it.    And the reason they didn't take it is because

19:24:22  16  they had no suspicions with regard to him in that

19:24:26  17  regard, in terms of the internet and electronic media.

19:24:30  18  Which is why, unlike Mr. Amawi and Mr. El-Hindi, there

19:24:33  19  is no such evidence seized or that was presented against

19:24:38  20  him.    And I think that's significant, Judge.    And that

19:24:41  21  ought to be a check in his favor, particularly in

19:24:45  22  comparison to the other two.

19:24:50  23            May I have just a minute, Your Honor?

19:24:53  24            THE COURT:  Of course.

19:25:02  25            (Discussion had off the record.)

19:25:02   1              MR. HELMICK:  Judge, I didn't plan on

19:25:03   2    spending a lot of time in terms of history and

19:25:06   3    characteristics and his childhood in Lebanon other than

19:25:11   4    it's laudable, him assuming the man of family at that

19:25:14   5    time.  I do bristle every time I read or hear the

19:25:17   6    suggestion by the government that somehow he is an

19:25:20   7    anti-semite because of an incursion --

19:25:24   8              THE COURT:  No, I don't interpret anything

19:25:26   9    the government said in that regard.  Just that as a

19:25:30  10    young child, he witnessed things that none of us have.

19:25:41  11    To the extent the government links that to anything, it

19:25:47  12    helped to provoke the interest in what he talked about,

19:25:54  13    certainly there's nothing to say that he ever thought

19:25:56  14    about at some point Israel.

19:26:06  15              MR. HELMICK:  I'd simply indicate the

19:26:08  16    evidence also reflects other incursions and problems

19:26:11  17    including from Syria.  It was not unique to Israel by

19:26:16  18    any means.  So in terms of a connection to U.S -- -

19:26:19  19              THE COURT:  I think that's outweighed by

19:26:22  20    what he's done with and for his family since coming

19:26:24  21    here.

19:26:25  22              MR. HELMICK:  Judge, I just indicate that

19:26:26  23    because something -- many things about this man and his

19:26:32  24    life and his family and his walking away ought to

19:26:36  25    mitigate in favor of sentence.  Over the past two days

19:26:39  1   I haven't heard the government concede that any
19:26:42  2   defendant's presented one mitigating factor.   Now they
19:26:48  3   want to argue it's entitled to little weight or no
19:26:51  4   weight.   That's another matter.   But I have yet --
19:26:53  5   whether someone came from a good family or bad family,
19:26:56  6   whether they have no record or a slight record, nothing
19:26:59  7   seeps to mitigate.   I'd suggest to the Court there's
19:27:01  8   much that mitigates about Wassim and the Court ought to
19:27:05  9   consider in this case.
19:27:10  10              Judge, I'd like to shift gears for a moment.
19:27:13  11  There's a lot of people here in the courtroom.   I'm not
19:27:16  12  going to introduce them all.   I simply want to make
19:27:19  13  reference to the fact there are at least 20 people here.
19:27:22  14  We lost about three, I think, because we were originally
19:27:26  15  scheduled for 2:30.   It happens.   But present today
19:27:29  16  are his mother, his two sisters, his brother, and
19:27:32  17  numerous aunts, uncles, cousins, friends and relatives
19:27:37  18  all here to show support.
19:27:38  19              While we're talking about that, Your Honor,
19:27:40  20  we may as well address the deportation issues.   While my
19:27:44  21  understanding from talking to my expert, which is
19:27:47  22  Mohammad Abdrabboh, who's on the telephone, who does a
19:27:51  23  great deal of work in the area, is that it is certainly
19:27:54  24  a possibility that's what the government wants to do, I
19:27:57  25  understand it's not a certainty, but that it is the call

19:28:00  1   of Immigrations and Customs Enforcement, and not

19:28:03  2   necessarily anything having anything to do with the

19:28:05  3   Department of Justice or these people here or this

19:28:12  4   Court.   But we are going to ask the Court to consider

19:28:14  5   recommending that he not be deported and that therefore

19:28:17  6   the Court can impose the type of supervised release that

19:28:22  7   the Court had envisioned in this case.   But beyond

19:28:26  8   that, Your Honor, I think the record fairly reflects

19:28:30  9   that he is not the risk the Court ought to be concerned

19:28:35  10  about if that ends up being beyond our control, beyond

19:28:38  11  his control, and he is deported.   I think that despite

19:28:42  12  what you heard during those recordings from November to

19:28:46  13  April, that's not a fair reflection of his life or his

19:28:51  14  predisposition in any way.   It's not a reflection of

19:28:54  15  his life since he entered the U.S. in 2000 until such

19:28:59  16  time he was recruited into this conspiracy.

19:29:01  17          THE COURT:  It may be a fair reflection in

19:29:05  18  the sense that it's there.  I think you're saying it's

19:29:08  19  not a full reflection or one that fully and fairly

19:29:11  20  presents the whole man.

19:29:12  21          MR. HELMICK:  Thank you.   That's much

19:29:14  22  better said.   Thank you, Your Honor.   That is what I

19:29:16  23  intended to say.

19:29:21  24          And, Your Honor, I do believe -- by the way,

19:29:23  25  Judge, yes, Mr. Herdman is correct in assuming he does

19:29:26   1   still have family back in Lebanon if he were deported.

19:29:29   2   It's also the intention of his family, his immediate

19:29:32   3   family to relocate if he were deported.   He would have

19:29:36   4   the benefit of his mother and sisters and brother even

19:29:39   5   though they have secured U.S. citizenship.   Their plan

19:29:42   6   is to support him, and their plan is to relocate.

19:29:46   7   Obviously a considerable sacrifice to them in terms of

19:29:50   8   what they've been able to establish here.   But that's

19:29:52   9   how close the bond is in this family.   And that's why

19:29:55  10   you see 20 people or so behind me that are here today to

19:30:00  11   support them, some of whom testified at the bond

19:30:03  12   hearing, some of whom testified at trial, some of whom

19:30:05  13   put up their property when he was on release.

19:30:08  14           In addition, Judge, you have that period of

19:30:10  15   time when he was out on release.   You took a big

19:30:14  16   chance, a lot of people might say, in letting him out.

19:30:17  17   He did not let you down during that period of time.

19:30:19  18   And interestingly, Judge, the government chose not to

19:30:22  19   appeal.   I don't doubt for a minute that it wouldn't

19:30:36  20   have been considered a frivolous appeal by the Circuit

19:30:39  21   that government had taken up his pretrial release order

19:30:42  22   from this Court had they chosen to do so.   They didn't.

19:30:44  23   That's not a criticism.   I'm commending the government.

19:30:47  24   They made the right decision in not doing that.   But if

19:30:51  25   he's such a great risk, Your Honor, why did they let him

19:30:54   1   out?   Admittedly, you had him on a short leash, quite

19:30:58   2   literally, in terms of the conditions during the time he

19:31:01   3   was released, but they didn't take it up, and he didn't

19:31:04   4   abuse your trust, and he has always been respectful to

19:31:07   5   the government, its employees, and to this court, and to

19:31:11   6   the law other than his involvement in this conspiracy as

19:31:14   7   has been charged an he's been convicted here.   And when

19:31:18   8   that day came, and the government, to their credit, gave

19:31:21   9   us a heads-up they would be asking for revocation of his

19:31:24  10   pretrial release if the jury verdict came back and he

19:31:27  11   was found guilty, and when they did, he instructed us

19:31:32  12   not to argue.   He said, it's fine; I'll go in.   And he

19:31:36  13   did it with grace; he did with it humility, and he did

19:31:40  14   it with the respect for the judicial system of this

19:31:43  15   Court and for the government at that time.   I don't

19:31:46  16   know what you would have done had he authorized us to

19:31:50  17   object to him going into custody.   Maybe you don't

19:31:52  18   know, Your Honor. But the fact is he didn't.   And he

19:31:55  19   was willing to do it.   He has always shown that abiding

19:31:58  20   respect.   And it's been true at Milan despite some

19:32:02  21   difficult conditions.   You might remember at first they

19:32:05  22   were all kind of forced together; made, I think,

19:32:07  23   government counsel and us quite uneasy.   But despite

19:32:12  24   all of that and throughout all that period of time he

19:32:15  25   has behaved himself commendably.   And I really do

19:32:19    1    believe the report supports that he was out of this.

19:32:23    2    He was back on the right path, back in school getting

19:32:26    3    his degree, working, and to support his family and

19:32:30    4    spurning ever overtures or interest from Mr. Griffin at

19:32:35    5    that time.

19:32:36    6                 Judge, may I have just a moment?

19:32:37    7                 THE COURT:  Sure.

19:33:50    8                 (Discussion had off the record.)

19:33:50    9                 MR. HELMICK:  Judge, one small point with

19:33:53   10    regard to recruitment into the conspiracy.   It's true

19:33:59   11    that the contact or common conduit or common friend

19:34:03   12    between Darren Griffin and Wassim Mazloum was Mr. Amawi.

19:34:07   13    But I think the record's pretty clear that it was Mr.

19:34:12   14    Griffin that was probing Mr. Amawi, inquiring of Mr.

19:34:16   15    Amawi, asking him --

19:34:17   16                 THE COURT:  I remember that well.

19:34:19   17                 MR. KERGER:  And pushing for him to reach

19:34:20   18    out and make that connection, Your Honor.

19:34:22   19                 THE COURT:  I remember that well.

19:34:42   20                 MR. HELMICK:  Judge, do you want me to

19:34:43   21    address the government's request for a life sentence?

19:34:45   22                 THE COURT:  No.   That's quite all right.

19:34:47   23    I do intend to vary.   I'll make my mind up how much.

19:34:53   24                 MR. HELMICK:  Very well, Your Honor.   Then

19:34:54   25    at this time, Judge, we have nothing more.  Depending on

19:34:57   1    what the government offers, we might like to be heard

19:34:59   2    again.

19:34:59   3              THE COURT:  Mr. Mazloum is prepared to speak

19:35:03   4    on his own behalf if you'd like him to do so?

19:35:06   5              MR. HELMICK:  Judge, may we have a few

19:35:08   6    minutes to talk to him?  I believe I mentioned that.

19:35:12   7    May we have a few minutes, please?

19:42:10   8              (Recess taken.)

19:42:17   9              THE COURT:  Mr. Helmick.

19:42:18  10              MR. HELMICK:  Your Honor, at this time Mr.

19:42:19  11    Mazloum wishes to address the Court briefly.

19:42:24  12              THE DEFENDANT:  Your Honor, I want to thank

19:42:33  13    you so much for allowing me to address the Court right

19:42:37  14    now.   I never thought I would be in this situation

19:42:42  15    before, and I'm really stressed out right now and really

19:42:45  16    nervous.   But I thought it's important that I address

19:42:49  17    you just so it won't be a point taken against me because

19:42:54  18    I know my life is --

19:42:58  19              THE COURT:   If you can clip that onto the

19:43:01  20    collar, it works better, rather than handheld.   Go

19:43:10  21    ahead.

19:43:11  22              THE DEFENDANT:  Your Honor, I would like to

19:43:13  23    make a couple good points.   Number one, I would like to

19:43:16  24    thank you so much for you putting your trust in me in

19:43:21  25    letting me out on bond.   And I believe I did not let

19:43:25   1   you down.  And hopefully, if anything, in the future

19:43:28   2   you'll be lenient in my sentence.  As a promise to you

19:43:31   3   and the government and to everybody, I won't let you

19:43:33   4   down again.  I'm not really conceding that I'm guilty,

19:43:39   5   and you know that -- I understand that's appeal there

19:43:43   6   and stuff like that, and I won't go into that stuff.  I

19:43:48   7   know I got caught in some situations with Griffin and

19:43:54   8   Amawi, and I said things that were wrong, that weren't

19:43:57   9   supposed to be said.  And I really, when I look back at

19:44:02  10   them, I regret them so much.  I never intend no harm.

19:44:06  11   Hopefully I will never, and for sure I will never harm

19:44:10  12   nobody in the future.  That's a promise.  The same

19:44:15  13   when I make a promise on bond, I'm going to make you a

19:44:18  14   promise in the future, a promise for you, for my family,

19:44:21  15   I don't want to put my family in very bad situation.  I

19:44:25  16   had to bring them to court and other things I never

19:44:28  17   imagine I would put them through, especially my mom.

19:44:31  18   She's sick.  She's having problems.  I would like to

19:44:34  19   get home as early as possible so I can take care of her.

19:44:37  20   I can spend the rest of my life with her.  I will care

19:44:41  21   for my sisters throughout all my life, and I really love

19:44:46  22   them so much, and they're -- they really need me out

19:44:52  23   there.  And it's a hard situation.  I'm just asking

19:44:58  24   for leniency.

19:44:59  25          I understand everything discussed in trial,

19:45:04   1   and the jury found me guilty.   I would like you also,

19:45:10   2   Judge, to consider something.   When we first was put in

19:45:14   3   Milan, we lived a year or a year and a half that was

19:45:18   4   almost living in a grave.

19:45:21   5              THE COURT:   That was?

19:45:22   6              THE DEFENDANT:   Almost like living in grave.

19:45:26   7   It was very bad situation.   Of course I tried to stay

19:45:29   8   out of trouble.   I tried to respect the persons in the

19:45:35   9   Bureau of Prisons and everything.   But I want you to

19:45:39  10   consider that because that year or year and a half in my

19:45:43  11   opinion was -- it was a lot.   I don't know how to

19:45:52  12   describe it in English.

19:45:52  13              (Short discussion had off the record.)

19:45:56  14              THE DEFENDANT:   Like receiving ten years,

19:45:59  15   that's what he says

19:46:04  16              And that's it, Your Honor.   Thank you very

19:46:06  17   much for allowing me to talk.

19:46:08  18              THE COURT:   Of course.

19:46:09  19              THE DEFENDANT:   Thank you.

19:46:10  20              THE COURT:   Anything further from the

19:46:11  21   government?

19:46:11  22              MR. HERDMAN:   Just briefly, Your Honor.   I

19:46:13  23   just wanted to clear up, Mr. Helmick made reference to

19:46:16  24   one of the clips we played.   It was at the beginning of

19:46:21  25   the February 16, 2005 meeting.   We don't remember having

19:46:25  1  that specific conversation with Mr. Helmick, but to the

19:46:28  2  extent that it is important at all, it's really the

19:46:31  3  reason that that conversation is important is that

19:46:33  4  that's the moment he walks through Mr. El-Hindi's house,

19:46:37  5  the conversation is not about sports or cars or women or

19:46:41  6  food or things that men usually talk about.  It's about

19:46:44  7  jihad.  And whether Mr. El-Hindi said that or Mr.

19:46:50  8  Mazloum --

19:46:50  9       THE COURT:  I understand.  It was said

19:46:51  10  early on.

19:46:52  11       MR. HERDMAN:  Yes.

19:46:54  12       A couple other quick points.  Defense

19:46:58  13  counsel has asked for you to make a recommendation

19:47:00  14  regarding not deporting Mr. Mazloum.  And our position

19:47:04  15  on this would be the same as it is with any other

19:47:07  16  request that's been made by defense counsel asking the

19:47:10  17  Court to make a certain recommendation.  It's been my

19:47:13  18  experience that dealing with CIS they don't do what the

19:47:17  19  DOJ asks them to do, and they don't usually do what the

19:47:20  20  Court --

19:47:20  21       THE COURT:  I won't ask you to join in any

19:47:22  22  such request.

19:47:26  23       MR. HERDMAN:  I'd ask the Court --

19:47:28  24       THE COURT:  I expect that I will make that

19:47:30  25  recommendation, realizing that it probably carries less

19:47:34  1    weight even than a recommendation to the Bureau of

19:47:37  2    Prisons.

19:47:37  3              MR. HERDMAN:  Actually, I was going to --

19:47:38  4    well, our position is, to clarify, is that you not make

19:47:41  5    any recommendation.  It's not any different than the

19:47:44  6    BOP making a recommendation that essentially, I don't

19:47:47  7    believe, carries any legal authority.  I may be wrong

19:47:50  8    about that.

19:47:50  9              THE COURT:  In this situation, because the

19:47:53  10   alternative to that is lifelong supervised release, I

19:47:57  11   think that would significantly aussage my concerns.  So

19:48:02  12   I will state that.  And if they pay attention, they pay

19:48:05  13   attention.  If they don't, they don't.  The request

19:48:09  14   has been made.  I'm inclined to go ahead -- go ahead.

19:48:13  15             MR. HERDMAN:  The notion that the

19:48:16  16   government, we didn't object to your decision on bond --

19:48:20  17             THE COURT:  I understand.  You made a

19:48:21  18   choice.  But what does matter is he did serve -- or

19:48:25  19   during that period of time there was no incident and no

19:48:30  20   concern raised by Pretrial Services.

19:48:33  21             MR. HERDMAN:  That was the only point I

19:48:35  22   wanted to make with respect to that.

19:48:36  23             THE COURT:  That doesn't surprise me, quite

19:48:38  24   candidly.  This is not the situation where you have

19:48:42  25   someone who's been involved in drugs or whatever.  It's

19:48:45   1   one of the reasons that I did release him.

19:48:47   2           MR. HERDMAN:  Mr. Mazloum just asked for, I

19:48:49   3   guess, some sort of leniency based on the, I guess,

19:48:52   4   conditions that he had at Milan at the outset of his

19:48:56   5   pretrial detention.  And I would just caution the

19:48:59   6   Court --

19:48:59   7           THE COURT:  I understand.  That's not a

19:49:00   8   relevant factor.

19:49:02   9           MR. HERDMAN:  Finally, I think it's -- I

19:49:05   10   think it's important that the government make clear that

19:49:07   11   all three defendants have addressed the Court, and I

19:49:12   12   don't believe any member of the government team has seen

19:49:15   13   anything that equates to or nearly approximates

19:49:19   14   acceptance of responsibility for their actions.  Mr.

19:49:22   15   Mazloum just said he's not conceding he's guilty.

19:49:24   16   That's his right to do so.  I can certainly understand

19:49:27   17   why his attorneys would want him to say that.  But when

19:49:30   18   this Court is considering whether or not he's accepted

19:49:34   19   what he did, whether or not he's expressed any remorse

19:49:38   20   for what he did, the fact that he has not said that and,

19:49:41   21   quite frankly, none of the defendants have that, I think

19:49:44   22   is of very paramount importance with respect to coming

19:49:49   23   up with an appropriate sentence.  I know Mr. Helmick

19:49:52   24   made a comment about the family, that Mr. Mazloum was

19:49:54   25   supporting his family.  And I just think it's very

| | | |
|---|---|---|
| 19:49:57 | 1 | important if we're going to have a last word on this, |
| 19:50:00 | 2 | and this is pretty much it, this is a man who was so |
| 19:50:04 | 3 | committed to this notion of engaging in jihad that he |
| 19:50:08 | 4 | offered up not just his livelihood, not just his means |
| 19:50:14 | 5 | of support, but that of his family.  And I think that |
| 19:50:16 | 6 | that fact is even more important, having been sort of |
| 19:50:23 | 7 | highlighted by the defense comments.  I think it's |
| 19:50:26 | 8 | important when considering who Mr. Mazloum is and what |
| 19:50:29 | 9 | he did and what he is capable of doing.  And that's all |
| 19:50:33 | 10 | I have from the government. |
| 19:50:35 | 11 | MR. HELMICK:  Judge, I don't have much more |
| 19:50:38 | 12 | except a couple of things.  I think there was value in |
| 19:50:42 | 13 | Mr. Mazloum's statement.  Whether it constitutes a |
| 19:50:46 | 14 | classic acceptance of responsibility, we didn't ask for |
| 19:50:50 | 15 | such a declaration or points.  We obviously have |
| 19:50:54 | 16 | cautioned him about what he says and at he does when his |
| 19:50:57 | 17 | case is going to go up on appeal.  But he knew in |
| 19:51:00 | 18 | essence everything I was going to say to the Court, and |
| 19:51:03 | 19 | including that he got in the wrong path, that he got |
| 19:51:08 | 20 | back on the right path.  We haven't spent any time today |
| 19:51:12 | 21 | challenging the legitimacy or validity of the jury's |
| 19:51:15 | 22 | conclusion of the government's case.  And I hope the |
| 19:51:20 | 23 | Court found some basis, some meaning, some benefit for |
| 19:51:24 | 24 | him in his statement.  That's certainly how it was |
| 19:51:30 | 25 | offered, genuinely and with that intent, and we would |

19:51:33  1    ask the Court to take another chance on Wassim, as you

19:51:37  2    did during pretrial release.   Thank you, Judge.

19:51:39  3              THE COURT:   Okay.   I'm going to step down

19:51:42  4    for a moment.

19:51:43  5                              *  *  *

19:58:47  6              (Recess taken.)

19:59:23  7              THE COURT:   Before pronouncing sentence, I

19:59:26  8    am going to vary substantially, and I will be imposing a

19:59:30  9    sentence of 100 months.   Let me explain why I am.

19:59:34  10   Before I do, I want to acknowledge the government's very

19:59:40  11   thoughtful commentary on the evidence because, quite

19:59:48  12   honestly, it called to mind some things that had not

19:59:53  13   been called to mind, despite the brief and everything

20:00:00  14   else.   And that's not to say that your colleagues didn't

20:00:05  15   likewise raise several issues for consideration, but in

20:00:09  16   this case, quite candidly, I've been thinking about --

20:00:14  17   I'd been thinking about something more lenient than

20:00:17  18   that.   And I think the real issue and question here is

20:00:22  19   both the issue of public deterrence, but also private

20:00:25  20   deterrence.   And I think on balance that Mr. Helmick

20:00:32  21   responded to those concerns and has persuaded me that

20:00:37  22   the risk of recidivism of any sort, most particularly

20:00:42  23   recidivism with regard to this kind of activity, is

20:00:49  24   sufficiently slight, though, of course, always present,

20:00:54  25   that this sentence is not greater than is necessary to

20:00:57  1   accomplish the objectives and purposes of sentencing.

20:01:04  2        And in terms of the defendant's own history

20:01:11  3   and characteristics, I'll try to back up and cover the

20:01:15  4   other factors I've taken into account.  I do believe

20:01:22  5   that he had, in his own mind, abandoned his

20:01:28  6   participation and dedication to doing the very, very

20:01:33  7   troublesome things that Mr. Herdman so succinctly and so

20:01:42  8   thoroughly pointed out.  Without question I think this

20:01:48  9   defendant more immediately and indeed perhaps more

20:01:56  10  thoroughly embraced and extolled the -- what the jury

20:02:09  11  has found to be the purposes of the conspiracy.  But I

20:02:15  12  think just as quickly and as brilliantly as that flame

20:02:24  13  flared up, I truly believe that it was extinguished or

20:02:30  14  certainly flickered and has flared out.  Again, one can

20:02:40  15  never say.  Like a smoldering ember, it might someday

20:02:45  16  flare back up, and I might be deeply regretful for

20:02:50  17  having been as lenient as I believe my sentence is.

20:02:56  18  It's a very substantial departure -- excuse me,

20:02:59  19  variance.

20:03:03  20       I have stated earlier I will simply make an

20:03:08  21  allusion in passing to the seriousness of this offense,

20:03:11  22  and I think quite seriously the offense with which the

20:03:13  23  defendant initially grabbed hold of the opportunity or

20:03:22  24  apparent opportunity that Mr. Griffin was providing.  I

20:03:30  25  think, though, when one looks at the entire picture

| | | |
|---|---|---|
| 20:03:39 | 1 | presented by this young man, and with particular |
| 20:03:43 | 2 | reference to how he has assumed adult responsibilities |
| 20:03:51 | 3 | in an adult way before he was even an adolescent and, |
| 20:04:00 | 4 | however, enduring the period of his most intense |
| 20:04:07 | 5 | flirtation with the conspiracy and its objectives, he |
| 20:04:10 | 6 | continued to fulfill those obligations, and he has |
| 20:04:18 | 7 | continued to do so since then.   He has returned to |
| 20:04:24 | 8 | school; he's nearly completed a degree.   He has |
| 20:04:26 | 9 | operated a business, and he has been, as I understand |
| 20:04:36 | 10 | it, probably not the sole support of his family when you |
| 20:04:40 | 11 | have a family as large as this, I'm sure many people |
| 20:04:43 | 12 | contribute, but he certainly has shouldered rather than |
| 20:04:47 | 13 | shirked responsibility that has been borne for 16 or 17 |
| 20:04:52 | 14 | years.   And I think that truly is the individual who |
| 20:04:57 | 15 | stands before me this evening and that that is the |
| 20:04:59 | 16 | individual whom I must sentence.   And I do think that |
| 20:05:08 | 17 | the sentence would, in the eyes of those who fully |
| 20:05:13 | 18 | understand all the circumstances, promote respect for |
| 20:05:17 | 19 | the law.   I believe the sentence is a just sentence and |
| 20:05:23 | 20 | one that does accommodate because, quite candidly, in my |
| 20:05:27 | 21 | sort of tentative mulling this all over, I was giving |
| 20:05:32 | 22 | thought to an even more lenient sentence.   And I am |
| 20:05:37 | 23 | persuaded that this sentence is the one that is |
| 20:05:43 | 24 | appropriate under all the circumstances, and it is a |
| 20:05:50 | 25 | sentence that is necessary to accomplish the objectives |

20:05:56   1   of sentencing.

20:06:02   2         I believe that this will adequately deter

20:06:06   3   the defendant.   And I hope that, once again, this

20:06:11   4   sentence sends a message that one must be cautious; one

20:06:22   5   must not be trusting; one must not let one's views,

20:06:26   6   whatever their origin may be, or however intensely they

20:06:31   7   may be felt about our government, its activities, its

20:06:35   8   policies, its use of military force, to cross the line

20:06:41   9   into expressing the kinds of things Mr. Mazloum

20:06:47  10   expressed and the kinds of desires that he expressed

20:06:54  11   about acting in an aggressive, hostile, violent and

20:07:02  12   potentially deadly way against our forces and others.

20:07:10  13   People simply have to understand that given the nature

20:07:14  14   of the threat posed to this country and many other

20:07:23  15   countries, the evil of terrorism can mean the difference

20:07:34  16   of ^  terrorism [sic] for the sanctity of human life and

20:07:37  17   human endeavor; that our government will undertake and

20:07:43  18   is, in my view, as I said earlier, fully justified in

20:07:46  19   undertaking the kind of investigation which proceeds

20:07:54  20   without any firm knowledge or even anticipation that

20:07:57  21   anything may result, where it simply casts a net and

20:08:04  22   sees what comes swimming by and comes swimming into that

20:08:09  23   net and goes from there.   Terrorism is an offense

20:08:16  24   ultimately against humanity.   And I can, quite

20:08:22  25   candidly, think of no more vile or vicious or

20:08:27  1  unjustifiable offense that anybody not only can commit,

20:08:31  2  but can even contemplate.   And I hope that this

20:08:35  3  sentence and the other sentences I've passed in this

20:08:39  4  case makes clear that at least as far as this Judge and

20:08:44  5  this Court is concerned, contemplation plus undertaking,

20:08:52  6  contemplation plus manifesting a desire and willingness

20:08:56  7  to others to become able and equipped and ready to

20:09:03  8  engage in terrorism of any kind and any sort against

20:09:07  9  anybody should be punished viciously and severely.

20:09:13  10          And I think, knowing that the government

20:09:16  11  disagrees with me completely, that in this case and as

20:09:20  12  to this defendant it is an adequately severe sentence to

20:09:24  13  communicate that message and that, once again, I do not

20:09:34  14  think in sending this message either I or the

20:09:37  15  government, whose successful investigation requires me

20:09:41  16  to send it, is seeking to or, in fact, is chilling the

20:09:49  17  First Amendment rights of any law abiding citizen in

20:09:53  18  this country despite this message and that effort and

20:09:58  19  all the other efforts that the government is undertaking

20:10:04  20  of a similar sort and character.  I do not think any

20:10:10  21  person has any reason to fear any adverse consequence

20:10:13  22  from the full and robust exercise of the their right to

20:10:19  23  speak both privately and publicly on issues of concern,

20:10:23  24  whatever they may be, and whatever those words may be.

20:10:30  25  Nor do I think that this sentence -- I certainly hope it

20:10:33  1   does not chill the right of anybody to exercise the

20:10:38  2   freedom of association or the freedom of religion.    I

20:10:42  3   think the government is absolutely correct that despite

20:10:46  4   whatever perception may exist in this or any other

20:10:48  5   community, this is not an investigation, a prosecution,

20:10:55  6   or a proceeding that targets persons of the Islamic

20:10:59  7   faith.   It targets, rather, and seeks to defend against

20:11:06  8   and deter the dangers and risks of terrorism.   Muslims

20:11:14  9   are as endangered by that as any other members of our

20:11:18  10  society; and they are, just like any other members of

20:11:22  11  our society, are entitled to the protection that

20:11:25  12  prosecutions -- investigations, prosecutions,

20:11:30  13  convictions, and sentences of the sort that I impose now

20:11:35  14  and imposed earlier today hopefully give to each and

20:11:39  15  every one of us.   And I believe that this sentence in

20:11:44  16  this case provides another measure of public deterrence

20:11:50  17  in conjunction with the other sentences meted out in

20:11:54  18  this case.   In doing so I believe I have adequately

20:11:59  19  accommodated and protected the public interest because

20:12:03  20  at the heart of what we've been doing the last couple of

20:12:06  21  days and the last week is invoking the authority of this

20:12:11  22  Court to do that, and do that most of all.   And I

20:12:14  23  believe that this sentence does accomplish that

20:12:19  24  fundamentally crucial and important purpose.

20:12:24  25           This sentence may as well, and indeed I hope

20:12:26  1    that it does provide this defendant, who does stand upon

20:12:31  2    the threshold of completing his undergraduate education,

20:12:37  3    I hope that wherever he is confined that he will be able

20:12:41  4    to fulfill the rest of his requirements and determine

20:12:47  5    either here or, if deported, Lebanon at the very least a

20:12:52  6    bachelor's degree and the opportunities to engage in a

20:12:57  7    productive and law abiding career that that degree might

20:13:03  8    help to provide.

20:13:10  9          So therefore formally to pronounce my

20:13:14  10   sentence, pursuant to the Sentencing Reform Act of 1984

20:13:31  11   and 18 U.S. Code Section 3553(a), it is the judgment of

20:13:36  12   this Court that the Defendant, Wassim Mazloum, be and

20:13:39  13   hereby is committed to the custody of the Bureau of

20:13:42  14   Prisons to be imprisoned for a term of 100 months as to

20:13:49  15   Count 1, and 100 months as to Count 2, those sentences

20:13:54  16   to be served concurrently.

20:13:56  17         Upon release from imprisonment, if he is not

20:13:59  18   remitted forthwith to the custody of Immigration and

20:14:03  19   Customs Enforcement, or whatever successor agency may be

20:14:07  20   responsible for instituting deportation proceedings, he

20:14:12  21   shall be placed on supervised release for a life term as

20:14:16  22   to Counts 1 and 2.   If he is not held for deportation,

20:14:21  23   he shall report within 72 hours of release from

20:14:24  24   imprisonment to the custody of the Bureau of Prisons,

20:14:27  25   the Probation Office in the district to which he's

20:14:29  1  released, or the Pretrial Service and Probation Office

20:14:33  2  in this district.

20:14:36  3          No fine shall be imposed.

20:14:38  4          The defendant does have to pay a special

20:14:40  5  assessment of $200 which is due immediately.  If not

20:14:44  6  paid, it will be taken from his prison earnings.

20:14:47  7          While on supervised release, he shall comply

20:14:49  8  with all the standard conditions routinely imposed by

20:14:52  9  this Court and of which he will be made aware upon

20:14:55  10  commencement of supervised release.  You shall not

20:14:57  11  commit another federal, state, or local crime; shall not

20:15:01  12  illegally possess a controlled substance; shall comply

20:15:03  13  with the standard conditions that have been adopted by

20:15:06  14  this Court; and following additional conditions: the

20:15:09  15  mandatory drug testing requirement will not be imposed.

20:15:14  16  You shall not possess a firearm, destructive device, or

20:15:17  17  dangerous weapon.  If a detainer is lodged -- and,

20:15:21  18  Deputy, a detainer has been lodged?

20:15:24  19          THE DEPUTY MARSHAL:  That is correct, Your

20:15:28  20  Honor; it has been lodged.

20:15:29  21          THE COURT:  If that detainer is not executed

20:15:31  22  but is withdrawn and he is released, shall surrender to

20:15:36  23  the Bureau of Immigration and Customs Enforcement, U.S.

20:15:39  24  Department of Homeland Security for deportation.  And

20:15:43  25  you should cooperate fully in deportation proceedings.

20:15:48  1    And you shall not, if deported, thereafter illegally

20:15:51  2    reenter or remain within the United States.   That

20:15:54  3    means, Mr. Mazloum, if that happens -- I wish to express

20:15:58  4    that I hope that it does not, for a couple of reasons.

20:16:02  5    Quite candidly, principally, that way we can keep much

20:16:05  6    better control over you and what you do.   I'll take

20:16:10  7    note of Mr. Helmick's representation your family members

20:16:15  8    anticipate returning to Lebanon.   If they do, that will

20:16:18  9    probably provide the greatest measure of security

20:16:21  10   against any recidivism on your part simply because if

20:16:25  11   they make that investment, for you to betray that

20:16:29  12   investment and commitment on their part, quite candidly,

20:16:33  13   would be unthinkable and unpardonable.   But if you are

20:16:41  14   deported, to return lawfully to this country you must

20:16:46  15   obtain prior approval of -- the Attorney General?

20:16:53  16            MR. SOFER:  Yes.   I think there's an another

20:16:58  17   designee as well.

20:16:59  18            THE COURT:  That's the one customarily

20:17:02  19   people don't comply with that results in prosecution.

20:17:07  20            If on supervised release you shall submit

20:17:11  21   your person, residence, place of business, computer, or

20:17:14  22   vehicle to a warrantless search, conducted and

20:17:16  23   controlled by the U.S. Probation Officer at a reasonable

20:17:18  24   time and in a reasonable manner, based on reasonable

20:17:20  25   suspicion of possession of contraband or evidence of a

20:17:23  1   violation of supervised release.   Failure to submit to

20:17:25  2   a search may be grounds for revocation.   You shall

20:17:28  3   inform any other residents that the premises may be

20:17:31  4   subject to a search pursuant to this condition.

20:17:36  5         If on supervised release you shall provide

20:17:38  6   the probation officer with any and all requested

20:17:41  7   financial information.

20:17:43  8         You shall diligently seek to obtain; and if

20:17:45  9   you obtain, diligently seek to maintain lawful, gainful

20:17:49  10  employment.   You shall cooperate in the collection of

20:17:51  11  DNA required by the probation officer.   You shall not

20:17:55  12  associate with any members of a threat group as

20:17:58  13  determined by the probation officer.

20:18:00  14        Do you wish me to make a request as to place

20:18:03  15  of confinement, realizing that it may be entirely futile

20:18:07  16  for me to do so?

20:18:08  17        MR. HELMICK:  Judge, we understand that the

20:18:11  18  BOP isn't bound by whatever you recommend.  We also

20:18:16  19  understand classification issues may conclude it.  But

20:18:21  20  if the Court would recommend Milan, Michigan FCI.

20:18:24  21        THE COURT:  I will make that recommendation.

20:18:25  22  Are there any objections to -- let me ask you this --

20:18:28  23  once again, let me ask counsel whether there are any

20:18:31  24  other factors or considerations that I'm required to

20:18:34  25  take into account that I've overlooked?

20:18:39  1          MR. HERDMAN:  I believe you've enumerated

20:18:41  2   all the factors.

20:18:43  3          MR. HELMICK:  Everything's fine.

20:18:44  4          THE COURT:  Does the government have any

20:18:46  5   objection to any part of these proceedings not

20:18:48  6   previously made?

20:18:50  7          MR. HERDMAN:  I can't think of any, Your

20:18:52  8   Honor.  Other than the ones previously made, no.

20:18:56  9          THE COURT:  And, Mr. Helmick, do you or your

20:18:58  10  client have any objection to any part of the proceedings

20:19:01  11  that have not been previously made?

20:19:03  12         MR. HELMICK:  No, Your Honor.  Thank you.

20:19:04  13         THE COURT:  Mr. Mazloum, as I trust you've

20:19:06  14  already been made aware, you have the absolute right to

20:19:09  15  take an appeal from the conviction and sentence.  I

20:19:12  16  encourage you to do so.  It is your right, and I see no

20:19:17  17  reason why you should not exercise that.

20:19:19  18         THE DEFENDANT:  Thank you.

20:19:20  19         THE COURT:  In doing so, you will have the

20:19:21  20  absolute right to be represented by counsel.  Discuss

20:19:25  21  with Mr. Helmick and Mr. Doughten whether you would

20:19:27  22  prefer to have other counsel than they representing you.

20:19:31  23  That is your choice.  If so, they will see to it that

20:19:34  24  successor counsel is appointed for purposes of appeal.

20:19:38  25  Do you understand that?

20:19:38  1            THE DEFENDANT:  Yes, Your Honor.

20:19:40  2            THE COURT:  If you fail to take a timely

20:19:43  3  appeal, you will lose forever any right that you might

20:19:46  4  otherwise have had to challenge either your conviction

20:19:48  5  or your sentence by way of direct appeal, postconviction

20:19:52  6  relief, habeas corpus, or otherwise.   Do you understand

20:19:56  7  that?

20:19:57  8            THE DEFENDANT:  Yes, Your Honor.

20:19:57  9            THE COURT:  Anything further from the United

20:20:00  10  States?

20:20:00  11            MR. HERDMAN:  No, Your Honor.

20:20:01  12            THE COURT:  Anything further from the

20:20:02  13  defendant?

20:20:03  14            MR. HELMICK:  No.  Thank you, Your Honor.

20:20:04  15            THE COURT:  That will conclude this

20:20:05  16  proceeding.

         17            (Concluded at 8:20 p.m.)

         18                     - - -

         19

         20

         21

         22

         23

         24

         25

1               **C E R T I F I C A T E**

2

3       I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled

5    matter.

6

7    /s Tracy L. Spore_____                    _____

8    Tracy L. Spore, RMR, CRR                     Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25